FEDERAL ELECTION COMMISSION

v.

NRA POLITICAL VICTORY
FUND, et al., Appellants.

No. 91–5360.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 1, 1993.

Decided Oct. 22, 1993.

As Amended Oct. 25, 1993.

Charles J. Cooper, with whom Michael A. Carvin, Robert J. Cynkar, and Elisabeth T. Roth, Washington, DC, were on the brief, for appellants.

Richard B. Bader, Associate Gen. Counsel, Federal Election Com'n, with whom Lawrence M. Noble, Gen. Counsel, and Marcus C. Migliore, Atty., Federal Election Commission, Washington, DC, were on the brief, for appellee.

Before WALD, RUTH BADER GINSBURG,* and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

This enforcement action by the Federal Election Commission concerns a transfer of $415,744.72 from the National Rifle Association Institute for Legislative Action (NRA–ILA) to its political action committee, the NRA Political Victory Fund (PVF). The district court held that the transfer was a "contribution" prohibited by the Federal Election Campaign Act (FECA), 2 U.S.C. §§ 431 et seq. (1988), and rejected appellants' various constitutional arguments based on the First Amendment and separation of powers.

We believe that the Commission lacks authority to bring this enforcement action because its composition violates the Constitution's separation of powers. Congress exceeded its legislative authority when it placed its agents, the Secretary of the Senate and the Clerk of the House of Representatives, on the independent Commission as non-voting ex officio members. We therefore reverse.

## I.

In March and July of 1988, PVF sent a letter to all NRA members soliciting funds to finance its activities in the upcoming November elections. The cost of the two mailings totalled $415,744.72. NRA–ILA paid the vendors the full amount on behalf of PVF. On August 1, 1988, PVF reimbursed NRA–ILA for these payments, an action it soon regretted because of a shortfall in PVF's operating budget. Accordingly, on October 20, 1988, NRA–ILA wrote a check to PVF to return the reimbursement. In the final weeks before the fall elections, PVF used its funds, which included the $415,744.72, to make independent expenditures (such as television or print advertisements) on behalf of candidates and to contribute directly to political campaigns.

The Commission does not challenge the propriety of the first two transactions. NRA–ILA's initial payments to vendors fall within section 441b(b)(2)(C), which permits a corporation to pay for the expenses of its political action committee in connection with direct solicitation of members. 2 U.S.C. § 441b(b)(2)(C) (1988). PVF's reimbursement to NRA–ILA is lawful because FECA does not restrict the flow of money from a political action committee to its parent corporation.

The Commission, however, notified appellants in October 1989 that it had reason to believe that the third transaction violated 2 U.S.C. § 441b(a) (1988), which prohibits corporate contributions and expenditures in connection with federal elections. Appellants disagreed and argued that the Commission had improperly considered the third transfer as if it were isolated from the two prior transactions. When statutorily mandated negotiations failed in late 1990, the Commission brought this civil enforcement action, see 2 U.S.C. § 437g(a)(6)(A) (1988), against NRA–ILA for making the illegal contribution, PVF for accepting it, and Grant A. Wills for facilitating it as Treasurer of PVF. See 2 U.S.C. § 441b(a) (1988).

Both sides moved for summary judgment. Appellants argued that the transaction did not violate section 441b(a), that the Commission lacked authority to act against them because certain features of the operation and composition of the Commission violate separation of powers principles, and that the transaction was protected by the First Amendment under the Supreme Court's decision in *Federal Election Comm'n v. Massa-*

---

* Former Circuit Judge Ruth B. Ginsburg, now an Associate Justice of the Supreme Court of the United States, was a member of the panel when the case was argued but did not participate in this opinion.

chusetts Citizens for Life, Inc., 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986).

The district court determined that the October 20, 1988, transfer was a "contribution" in violation of section 441b(a). The court held that appellants' separation of powers arguments were non-justiciable and rejected their First Amendment claims. The court imposed a civil penalty equal to the Commission's cost of investigating and prosecuting the action, and enjoined appellants from similar transfers in the future. See Federal Election Comm'n v. NRA Political Victory Fund, 778 F.Supp. 62 (D.D.C.1991). Appellants essentially repeat their arguments on appeal, contending that the district court erred in deciding each of their claims.

## II.

Because we hold that the composition of the Commission violates separation of powers, we do not pass on appellants' arguments based on the First Amendment as well as those turning on statutory interpretation. Although courts should " 'refrain from passing on the constitutionality of an act of Congress unless obliged to do so,' " Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 341, 56 S.Ct. 466, 480, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (quoting Blair v. United States, 250 U.S. 273, 279, 39 S.Ct. 468, 470, 63 L.Ed. 979 (1919)), we note that in this unusual circumstance we need not find a violation of section 441b before addressing the separation of powers claim. The Supreme Court in similar situations—when plaintiffs challenged the constitutional composition or character of a tribunal—determined the constitutional status issue without reaching the merits.[1] See, e.g., Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 859, 106 S.Ct. 3245, 3261, 92 L.Ed.2d 675 (1986) (upholding constitutionality of CFTC's authority to adjudicate common law counterclaims without passing on the merits of the counterclaim); Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50,

56, 87, 102 S.Ct. 2858, 2864, 2880, 73 L.Ed.2d 598 (1982) (holding that the bankruptcy courts' jurisdiction to adjudicate common law claims violated Article III without deciding the claims).[2]

Appellants claim that the composition of the Commission, particularly its two ex officio members, violates the Constitution's separation of powers. In 1974, Congress amended FECA to create the Commission and charged it with administering the Act. The Commission then, as now, had eight members: the Secretary of the Senate and the Clerk of the House of Representatives (non-voting and ex officio ), and six voting members whom Congress played varying roles in appointing. In Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court held, inter alia, that the limitations Congress placed on the President's power to nominate voting members of the Commission violated the Appointments Clause. Although the Court mentioned the ex officio members, see id. at 113, 96 S.Ct. at 679, it never discussed the constitutionality of their status.

After Buckley, Congress reconstituted the Commission as follows:

> The Commission is composed of the Secretary of the Senate and the Clerk of the House of Representatives or their designees, ex officio and without the right to vote, and 6 members appointed by the President, by and with the advice and consent of the Senate. No more than 3 members of the Commission appointed under this paragraph may be affiliated with the same political party.

2 U.S.C. § 437c(a)(1) (1988).

It is argued that the reconstituted Commission still violates separation of powers principles in several respects. First, appellants urge that FECA's requirement that "[n]o more than 3 members of the Commission ... may be affiliated with the same political party," 2 U.S.C. § 437c(a)(1) (1988), impermissibly limits the President's nomina-

---

1. In any event, the statutory issue is intertwined with the First Amendment concerns.

2. We note, however, that the Court did not explicitly address whether it ought to decide the

constitutional question before addressing the merits of the underlying common law claims in these cases.

tion power under the Appointments Clause. Second, appellants maintain that the President does not exercise sufficient control over the Commission's civil enforcement authority, a core executive function, to satisfy the constitutional mandate that he "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. And finally, they assert that Congress exceeded its Article I authority by placing the Secretary and the Clerk on the Commission as *ex officio* members.

■ The Commission claims that appellants lack standing to raise the separation of powers claims. As has so often been said, standing requires a showing of (1) an injury in fact that is (2) fairly traceable to allegedly unlawful government action and (3) redressable by the requested relief. *See Metropolitan Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.,* —— U.S. ——, ——, 111 S.Ct. 2298, 2306, 115 L.Ed.2d 236 (1991) (citing *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)). This case does not raise the first and last of these requirements; civil sanctions are injuries in fact, and vacating the order imposing the sanctions redresses the injuries. The district court held, however, that appellants' injury is not "fairly traceable" to (caused by) the alleged constitutional defects of the Commission because appellants did not allege that the outcome of the Commission's decisionmaking process would have been different if it were composed differently.

■ We think the district court's conclusion was erroneous at least with respect to appellants' last two separation of powers arguments—that the independence of the Commission frustrates the President's executive power and that the *ex officio* members unconstitutionally serve on the Commission. A litigant "is not required to show that he has received less favorable treatment than he would have if the agency were lawfully constituted and otherwise authorized to discharge its functions." *Committee for Monetary Reform v. Board of Governors of Fed. Reserve Sys.,* 766 F.2d 538, 543 (D.C.Cir. 1985) (citation omitted); *see also Glidden Co. v. Zdanok,* 370 U.S. 530, 533, 82 S.Ct. 1459, 1463, 8 L.Ed.2d 671 (1962) ("The claim ad-

vanced by the petitioners, that they were denied the protection of [Article III] judges ... has nothing to do with the manner in which either of these judges conducted himself in these proceedings...."); *Andrade v. Lauer,* 729 F.2d 1475, 1496 (D.C.Cir.1984) (noting that litigants could "rarely or never" show that "if the government had operated in accord with [the Constitution], it would not have taken adverse action against them"). Instead, litigants need only demonstrate that they have been "directly subject to the authority of the agency." *Committee for Monetary Reform,* 766 F.2d at 543. Thus, in *Committee for Monetary Reform,* we denied standing to the plaintiff-appellants, private businesses and individuals who alleged that agency policy caused injurious monetary instability and high interest rates, because the agency "in no way exercise[s] direct governmental authority over the appellants." *Id.* at 544. Because an enforcement action is the paradigm of "direct governmental authority," appellants have standing to raise their arguments based on the Take Care Clause and Article I.

■ We agree with the district court, although using a different analysis, that appellants' challenge to the alleged restriction on the President's appointment power to select more than three commissioners from one party is not justiciable. Congressional limitations—even the placement of burdens—on the President's appointment power may raise serious constitutional questions. *See Public Citizen v. United States Dep't of Justice,* 491 U.S. 440, 466–67, 109 S.Ct. 2558, 2572–73, 105 L.Ed.2d 377 (1989). But it is impossible to determine in this case whether the *statute* actually limited the President's appointment power. Appellants do not argue, nor can we assume, that the President wished to appoint more than three members of one party and was restrained by FECA from doing so. Presidents have often viewed restrictions on their appointment power not to be legally binding. *See, e.g., Statement on Signing the Cranston–Gonzales National Affordable Housing Act,* 26 WEEKLY COMP. PRES. DOC. 1930, 1931 (Nov. 28, 1990) (Congressional limitations "do not constrain the President's constitutional authority to appoint officers of

the United States."); *Statement on Signing the National and Community Service Act of 1990,* 26 WEEKLY COMP. PRES. DOC. 1833, 1834 (Nov. 16, 1990); *Statement on Signing the Intelligence Authorization Act,* Fiscal Year 1990, 25 WEEKLY COMP. PRES. DOC. 1851, 1852 (Nov. 30, 1991). Of course, such legislation may impose political restraints. Particularly with respect to the Commission—for which, because of the sensitive political nature of its work, an equal number of members from each party was contemplated, *see Federal Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 37, 102 S.Ct. 38, 45, 70 L.Ed.2d 23 (1982) (noting that the Commission is "inherently bipartisan" and that "it must decide issues charged with dynamics of party politics"); H.R.REP. No. 917, 94th Cong., 2d Sess. 3 (1976) ("It is therefore essential in this sensitive area [of campaign regulation] that the system of administration and enforcement enacted into law does not provide room for partisan misuse....")—it is hard to imagine that the President would wish to alter that balance, even if the understanding had not been reflected in the statutory language. More important, as appellants recognize, under its Advice and Consent authority the Senate may reject or approve the President's nominees for whatever reason it deems proper. Since all commissioners must be confirmed by the Senate, it would seem that a Senate resolution or even an informal communication to the President would have the same effect as the statute. It is not the law, therefore, which arguably restrains the President, but his perception of the present Senate's view as it may be assumed to be reflected in the statute.

Superficially, appellants' claim here may appear to be analogous to its other challenges to the Commission's authority, concerning which we hold that they need not show that the Commission would have acted differently if it were constitutionally composed. *See supra* at 824. But these questions—whether the Commission is independent of the President because he cannot remove the commissioners and whether the *ex officio* members are present during the Commission's deliberations—have some impact (even though the extent of which may be impossible to measure) on how the Commission decides matters before it. *See Bowsher v. Synar,* 478 U.S. 714, 727 n. 5, 106 S.Ct. 3181, 3188 n. 5, 92 L.Ed.2d 583 (1986) (" '[I]t is the Comptroller General's presumed desire to avoid removal by pleasing Congress, which creates the here-and-now subservience to another branch that raises separation-of-powers problems.' ") (quoting *Synar v. United States,* 626 F.Supp. 1374, 1392 (D.D.C.1986)); *Metropolitan Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.,* —— U.S. ——, ——, 111 S.Ct. 2298, 2312, 115 L.Ed.2d 236 (1991) (holding unconstitutional a board of review comprised of members of Congress with veto power over certain executive functions, even though the statutory scheme "might prove to be innocuous"). We cannot assume, however, that the bipartisanship requirement has any effect on the Commission's work, for without the statute the President could have appointed exactly the same members. For appellants to prevail we would have to conclude that *all* the Commission's appointments were invalid because infected by the statute. Appellants do not allege that FECA affected the President's choice with respect to any particular nomination to the Commission, so the constitutional status of all six commissioners is indistinguishable. If FECA is to be thought to have tainted any nomination, it tainted all.[3] Accordingly, in order to redress appellants' alleged injuries in this case, we must assume, without any factual support, that each of the commissioners would not have been appointed but for the statute. That we cannot do. It may well be that only if the President appoints and the Senate confirms a fourth same-party member to the Commission could the unconstitutionality of the bipartisanship requirement be regarded as justiciable, when the government raises it as a defense to the charge that the member's participation violates FECA.[4]

---

**3.** We could hardly hold only the appointments of commissioners appointed by a President of the opposite party invalid.

**4.** Perhaps the President could challenge the constitutionality of the law by alleging that the statute impinged on his appointment power with respect to a particular nomination.

Although appellants have standing to assert that the Commission acts unconstitutionally because of its independence of the President in its law enforcement activities, there is not much vitality to the claim after *Morrison v. Olson,* 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). *Morrison,* which held constitutional the independent counsel authorized by the Ethics in Government Act, approved a much greater diminution of presidential authority than presented in this case. The Commission is patterned on the classic independent regulatory agency sanctioned long before *Morrison* in *Humphrey's Executor v. United States,* 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). Although *Morrison* reconsidered the rationale of *Humphrey's Executor, see Morrison,* 487 U.S. at 689–90, 108 S.Ct. at 2618–19, it was certainly not for the purpose of expanding presidential power; the independent counsel, after all, exercised power previously possessed by the Justice Department, power that had been thought to be a traditional executive function. *See United States v. Nixon,* 418 U.S. 683, 693, 94 S.Ct. 3090, 3100, 41 L.Ed.2d 1039 (1974); *INS v. Chadha,* 462 U.S. 919, 1002, 103 S.Ct. 2764, 2810, 77 L.Ed.2d 317 (1983) (White, J., dissenting); *Committee for Creative Non–Violence v. Pierce,* 786 F.2d 1199, 1201 (D.C.Cir.1986). Appellants would distinguish *Morrison* on the grounds that the Act explicitly empowered the Attorney General (hence the President) to remove an independent counsel for "good cause." Here the statute is silent as to the President's removal authority, and therefore appellants argue that he has none. However, statutory silence could imply that the President actually enjoys an unrestricted power of removal. *See Shurtleff v. United States,* 189 U.S. 311, 316, 23 S.Ct. 535, 536, 47 L.Ed. 828 (1903). The Commission suggests that the President can remove the commissioners only for good cause, which limitation is implied by the Commission's structure and mission as well as the commissioners' terms. We think the Commission is likely correct, but, in any event, we can safely assume that the President would at minimum have authority to discharge a commissioner for good cause—if for no other. *See SEC v. Blinder, Robinson & Co.,* 855 F.2d 677, 681 (10th Cir.1988) (recognizing the President's authority to remove SEC members for good cause despite governing statute's silence).

\*   \*   \*   \*   \*   \*

■ We turn now to appellants' more substantial claim. It is undisputed that both *ex officio* members are appointed by and are agents of Congress, and it is also settled that Congress may not appoint the voting members of this Commission or, indeed, any agency with executive powers. *See Bowsher v. Synar,* 478 U.S. 714, 732–33, 106 S.Ct. 3181, 3191–92, 92 L.Ed.2d 583 (1986); *Buckley v. Valeo,* 424 U.S. 1, 139–141, 96 S.Ct. 612, 691–93, 46 L.Ed.2d 659 (1976). There remains only the question whether *ex officio* non-voting members enjoy a different status for purposes of constitutional analysis.

The Commission would have us conclude that the *ex officio* members are constitutionally harmless. Non-voting members cannot serve as chairman, cannot call or adjourn a meeting, and are not counted in determining a quorum. In short, we are told that the *ex officio* members have no *actual* influence on agency decisionmaking. If that were so, congressional intent as reflected in the legislative history would seem frustrated. At least certain members of Congress clearly intended that the appointed officers serve its interests while serving as commissioners. *See* 122 CONG.REC. 6706 (1976) (statement of Senator Mansfield) (agreeing that "as an ex officio member, [the Secretary] would not just remain mute, that he could give advice and consent, that he could, in effect, represent the Senate's point of view"); *id.* (statement of Senator Cannon) (agreeing with Senator Mansfield with respect to campaign finance matters "as related to the Senate").

Legislative history aside, we cannot conceive why Congress would wish or expect its officials to serve as *ex officio* members if not to exercise *some* influence. Even if the *ex officio* members were to remain completely silent during all deliberations (a rather unlikely scenario), their mere presence as agents of Congress conveys a tacit message to the other commissioners. The message may well be an entirely appropriate one—but it nevertheless has the potential to influence the other commissioners. Federal law recog-

nizes in other contexts that non-voting participation can influence a decisionmaking process. For example, FED.R.CRIM.P. 24(c) states: "An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict." An alternate juror, of course, does not have a right to vote. The rationale animating this rule is that "[w]hen alternate jurors are present during the deliberations, the possible prejudice is that defendants are being tried not by a jury of 12, as is their right, but by a larger group." *United States v. Jones,* 763 F.2d 518, 523 (2d Cir.), *cert. denied,* 474 U.S. 981, 106 S.Ct. 386, 88 L.Ed.2d 339 (1985) (citations omitted).

In *Metropolitan Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.,* — U.S. —, 111 S.Ct. 2298, 115 L.Ed.2d 236 (1991) *("MWAA"),* the Supreme Court held unconstitutional a board of review composed entirely of members of Congress that had veto power over the decisions of regional airports authority. In so doing, the Court recognized that the "unique" arrangement "might prove innocuous." *Id.* at —, 111 S.Ct. at 2312. The Court invalidated the law, however, because "the statutory scheme challenged today provides a blueprint for extensive expansion of the legislative power beyond its constitutionally-confined role." *Id.* The Court recalled that the Framers recognized that "power is of an encroaching nature," THE FEDERALIST No. 48, at 332 (J. Madison) (J. Cooke ed. 1961), and therefore the Constitution imposes a structural ban on legislative intrusions into other governmental functions. *See MWAA,* — U.S. at —, 111 S.Ct. at 2310. It is true that the Court has not considered the circumstances of this case; the members of Congress in *MWAA* and the Comptroller General in *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), possessed explicit voting or decisionmaking power that is not present here. However, since "the legislature 'can with the greater facility, mask under complicated and indirect measures, the encroachments which it makes on the co-ordinate departments,' " *id.* — U.S.

at — – —, 111 S.Ct. at 2310–11 (quoting THE FEDERALIST No. 48, at 334), the mere presence of agents of Congress on an entity with executive powers offends the Constitution.

To be sure, as the Court has said often, the Constitution does not require a "hermetic sealing off of the three branches of Government." *Buckley,* 424 U.S. at 121, 96 S.Ct. at 683. The Constitution "enjoins upon its branches separateness but interdependence, autonomy but reciprocity," *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring), and it "anticipates that the coordinate Branches will converse with each other on matters of vital common interest." *Mistretta v. United States,* 488 U.S. 361, 408, 109 S.Ct. 647, 673, 102 L.Ed.2d 714 (1989). The Commission argues that Congress intended *ex officio* membership to fulfill this coordinating function by having the Secretary and the Clerk play a mere "informational or advisory role" in agency decisionmaking. Advice, however, surely implies influence, and Congress must limit the exercise of its influence, whether in the form of advice or not, to its legislative role. *MWAA,* — U.S. at —, 111 S.Ct. at 2311–12. In that capacity, Congress enjoys ample channels to advise, coordinate, and even directly influence an executive agency. It can do so through oversight hearings, appropriation and authorization legislation, or direct communication with the Commission.[5] What the Constitution prohibits Congress from doing, and what Congress does in this case, is to place its agents "beyond the legislative sphere" by naming them to membership on an entity with executive powers.

### III.

■ There remains the question of remedy. We need not concern ourselves with the effect of our opinion on the whole statute because FECA contains an explicit severability clause. *See* 2 U.S.C. § 454 ("If any provision of this Act ... is held invalid, the validi-

---

5. *But see Pillsbury Co. v. F.T.C.,* 354 F.2d 952, 964–65 (5th Cir.1966) (holding that Senate subcommittee proceedings where commissioners were questioned about their conduct in a specific case deprived the defendant corporation of due process).

ty of the remainder of the Act ... shall not be affected thereby."). That clause raises a presumption that Congress would wish the offending portion of the statute—creating the *ex officio* members of the Commission—to be severed from the rest. And the Supreme Court in *Buckley v. Valeo,* 424 U.S. 1, 108–09, 140, 96 S.Ct. 612, 677–78, 692, 46 L.Ed.2d 659 (1976), relying on that presumption, invalidated and severed a much greater portion of the statute—including, of course, the composition of the Commission. Indeed, Congress is not even required after our decision, as it was after *Buckley,* to amend the statute. Since what remains of FECA is not "unworkable and inequitable," *id.* at 252, 96 S.Ct. at 742 (Burger, C.J., concurring in part and dissenting in part), the unconstitutional *ex officio* membership provision can be severed from the rest of FECA.

The Commission asserts that, regardless of the constitutionality of the *ex officio* membership provision, we should not provide a remedy to appellants because under the *de facto* officer doctrine the enforcement actions of the Commission cannot be challenged.[6] Under that doctrine " 'where there is an office to be filled and one acting under color of authority fills the office and discharges its duties, his actions are those of an officer *de facto* and binding upon the public.' " *Glidden Co. v. Zdanok,* 370 U.S. 530, 535, 82 S.Ct. 1459, 1465, 8 L.Ed.2d 671 (1962) (plurality opinion of Harlan, J.) (quoting *McDowell v. United States,* 159 U.S. 596, 602, 16 S.Ct. 111, 113, 40 L.Ed. 271 (1895)). The Supreme Court in *Buckley v. Valeo,* 424 U.S. 1, 142, 96 S.Ct. 612, 693, 46 L.Ed.2d 659 (1976) relied on this theory (although without explicitly citing to the *de facto* officer doctrine) to

validate the Commission's past actions. But the relief sought by the plaintiffs there, declaratory and injunctive remedies, *see id.* at 9, 96 S.Ct. at 630, could have purely prospective impact. Here, by contrast, appellants raise the constitutional challenge as a defense to an enforcement action, and we are aware of no theory that would permit us to declare the Commission's structure unconstitutional without providing relief to the appellants in this case. The Supreme Court in *Northern Pipeline Constr. Co. v. Marathon Pipeline Co.,* 458 U.S. 50, 88, 102 S.Ct. 2858, 2880, 73 L.Ed.2d 598 (1982), declared an aspect of the bankruptcy law unconstitutional and stated that its opinion would act prospectively. Still, the party who challenged the constitutionality of the statute was afforded relief. *See id.* at 87 n. 40, 102 S.Ct. at 2880 n. 40. And the Court relied exclusively on *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), to limit the retroactive effect of its decision. *Chevron Oil* was recently rejected by the Court in *Harper v. Virginia Dep't of Taxation,* —— U.S. ——, ——, 113 S.Ct. 2510, 2517, 125 L.Ed.2d 74 (1993).

\*     \*     \*     \*     \*     \*

For the foregoing reasons, the judgment of the district court is hereby reversed.

*So Ordered.*

---

**6.** The Commission actually raises the *de facto* officer doctrine as an argument against justiciability, asserting that our inability to grant relief renders a decision purely advisory. This circular argument would foreclose any challenge to the authority of public officers, an effect that the *de facto* officer doctrine does not sanction. *See Andrade v. Lauer,* 729 F.2d 1475, 1498 (D.C.Cir.

1984) ("[T]he court should avoid an interpretation of the de facto officer doctrine that would likely make it impossible for these plaintiffs to bring their assumedly substantial constitutional claim and would render legal norms concerning appointment and eligibility to hold office unenforceable.").