# The Legal Significance of Presidential Signing Statements

Many Presidents have used signing statements to make substantive legal, constitutional, or administrative pronouncements on the bill being signed. These uses of Presidential signing statements generally serve legitimate and defensible purposes.

November 3, 1993

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

This memorandum provides you with an analysis of the legal significance of presidential signing statements. It is addressed to the questions that have been raised about the usefulness or validity of such statements. We believe that such statements may on appropriate occasions perform useful and legally significant functions. These functions include: (1) explaining to the public, and particularly to constituencies interested in the bill, what the President believes to be the likely effects of its adoption; (2) directing subordinate officers within the executive branch how to interpret or administer the enactment; and (3) informing Congress and the public that the Executive believes that a particular provision would be unconstitutional in certain of its applications, or that it is unconstitutional on its face, and that the provision will not be given effect by the executive branch to the extent that such enforcement would create an unconstitutional condition.[1]

These functions must be carefully distinguished from a much more controversial — and apparently recent — use of presidential signing statements, i.e., to create legislative history to which the courts are expected to give some weight when construing the enactment. In what follows, we outline the rationales for the first three functions, and then consider arguments for and against the fourth function.[2] The Appendix to the memorandum surveys the use of signing statements by earlier Presidents and provides examples of such statements that were intended to have legal significance or effects.

## I.

To begin with, it appears to be an uncontroversial use of signing statements to explain to the public, and more particularly to interested constituencies, what the

---

[1] In addition, signing statements have frequently been used for purposes of little or no legal or constitutional significance, e.g., to applaud or criticize the policy behind certain provisions, to advise Congress how the President will respond to future legislation, to condemn practices such as attaching riders to omnibus bills, to congratulate members of Congress or the public who have assisted in the bill's passage, and so forth

[2] We do not in this memorandum attempt to reach a definitive conclusion on the question whether the use of signing statements to create legislative history on which the courts are to rely is or is not legitimate We would be pleased to provide you with further research and analysis on that question should you so desire.

President understands to be the likely effects of the bill, and how the bill coheres or fails to cohere with the Administration's views or programs.[3]

A second, and also generally uncontroversial, function of presidential signing statements is to guide and direct executive officials in interpreting or administering a statute. The President has the constitutional authority to supervise and control the activity of subordinate officials within the executive branch. *See Franklin v. Massachusetts*, 505 U.S. 788, 800 (1992). In the exercise of that authority he may direct such officials how to interpret and apply the statutes they administer.[4] *Cf. Bowsher v. Synar*, 478 U.S. 714, 733 (1986) ("[i]nterpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law."). Signing statements have frequently expressed the President's intention to construe or administer a statute in a particular manner (often to save the statute from unconstitutionality), and such statements have the effect of binding the statutory interpretation of other executive branch officials.[5]

A third function, more controversial than either of the two considered above, is the use of signing statements to announce the President's view of the constitutionality of the legislation he is signing. This category embraces at least three species: statements that declare that the legislation (or relevant provisions) would be unconstitutional in certain applications; statements that purport to construe the legislation in a manner that would "save" it from unconstitutionality; and statements that state flatly that the legislation is unconstitutional on its face. Each of these species of statement may include a declaration as to how — or whether — the legislation will be enforced.

Thus, the President may use a signing statement to announce that, although the legislation is constitutional on its face, it would be unconstitutional in various applications, and that in such applications he will refuse to execute it. Such a Presidential statement could be analogized to a Supreme Court opinion that upheld

---

[3] For example, on signing the Omnibus Crime Control and Safe Streets Act of 1968, President Johnson explained in some detail how the wiretapping and eavesdropping provisions of the bill both agreed with and differed from his Administration's original proposals to Congress, criticized Congress's decision to sanction certain law enforcement eavesdropping and wiretapping, asked Congress to reconsider that decision, served notice that the Department of Justice would continue to follow a narrower policy of confining wiretapping and eavesdropping to national security cases only, and urged caution and restraint on the states in exercising the powers that the bill allowed them *See* 1 *Pub. Papers of Lyndon B Johnson* 726-27 (1968-69). And President Kennedy signed an education bill "with extreme reluctance," objecting to several provisions, including "the continuation of the discriminatory and ineffective non-Communist disclaimer affidavit." *Pub. Papers of John F. Kennedy* 637 (1961)

[4] There are, of course, limits to this Presidential authority Thus, the President cannot read into the Immigration and Nationality Act protection for a class of asylum seekers whom Congress did not include among those eligible for asylum *See* Memorandum for the Attorney General, from Walter Dellinger, Acting Assistant Attorney General, Office of Legal Counsel at 3 (Aug. 20, 1993)

[5] For example, when signing legislation governing the recruitment of agricultural workers from Mexico, President Kennedy made clear that the Labor Department would administer it so as to protect "the wages and working conditions of domestic agricultural workers." *Pub. Papers of John F Kennedy* at 640 Similarly, President Truman explained that the National Security Council would make broad use of the powers given to it under a rider to a foreign aid bill restricting trade with the Communist bloc to create exceptions from such restrictions *See Pub Papers of Harry S. Truman* 319 (1951).

legislation against a facial constitutional challenge, but warned at the same time that certain applications of the act would be unconstitutional. *Cf. Bowen v. Kendrick,* 487 U.S. 589, 622-24 (1988) (O'Connor, J., concurring). Relatedly, a signing statement may put forward a "saving" construction of the bill, explaining that the President will construe it in a certain manner in order to avoid constitutional difficulties. *See FEC v. NRA Political Victory Fund,* 6 F.3d 821, 824-25 (D.C. Cir. 1993) (Silberman, J., joined by Wald, J.) (citing two presidential signing statements adopting "saving" construction of legislation limiting appointment power), *cert. dismissed,* 513 U.S. 88 (1994). This, too, is analogous to the Supreme Court's practice of construing statutes, if possible, to avoid holding them unconstitutional, or even to avoid deciding difficult constitutional questions.

More boldly still, the President may declare in a signing statement that a provision of the bill before him is flatly unconstitutional, and that he will refuse to enforce it. This species of statement merits separate discussion.[6]

In each of the last three Administrations, the Department of Justice has advised the President that the Constitution provides him with the authority to decline to enforce a clearly unconstitutional law.[7] This advice is, we believe, consistent with the views of the Framers.[8] Moreover, four sitting Justices of the Supreme Court have joined in the opinion that the President may resist laws that encroach upon his powers by "disregard[ing] them when they are unconstitutional." *Freytag v. Commissioner,* 501 U.S. 868, 906 (1991) (Scalia, J., joined by O'Connor, Kennedy and Souter, JJ., concurring in part and concurring in judgment).[9]

---

[6] One reason such signing statements may be controversial is that the refusal to execute a statutory provision has substantially the effect of a line-item veto.

[7] *See, e.g., The Attorney General's Duty to Defend and Enforce Constitutionally Objectionable Legislation,* 4A Op O L C 55, 59 (1980) (Civiletti, A G); *Recommendation that the Department of Justice not Defend the Constitutionality of Certain Provisions of the Bankruptcy Amendments and Federal Judgeship Act of 1984,* 8 Op. O.L C 183, 195 (1984). This advice is consistent with that given by Attorneys General to earlier Presidents, including Presidents Buchanan, *see Memorial of Captain Meigs,* 9 Op Att'y Gen. 462, 469-70 (1860), and Wilson, *see Income Tax — Salaries of President and Federal Judges,* 31 Op Att'y Gen 475, 476 (1919), that the President was not bound by a law that unconstitutionally encroached on his powers

[8] For example, James Wilson, a prominent Framer, legal theorist, and later Associate Justice of the Supreme Court, told the Pennsylvania ratifiers that

> the power of the Constitution was paramount to the power of the legislature acting under that Constitution; for it is possible that the legislature . . . may transgress the bounds assigned to it, and an act may pass, in the usual *mode,* notwithstanding that transgression; but when it comes to be discussed before *the judges .* it is their duty to pronounce it void . . *In the same manner, the President of the United States could shield himself, and refuse to carry into effect an act that violates the Constitution*

2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 446 (Jonathan Elliot, ed., 2d ed 1836) (third emphasis added).

Also relevant (despite the fact that he did not attend the Philadelphia Convention) are the views of Thomas Jefferson. Believing that the Sedition Law was unconstitutional even though it had been upheld by the courts, Jefferson used his power as President to (in his own words) "remit the execution" of the Act by pardoning all offenders *See* Norman J. Small, *Some Presidential Interpretations of the Presidency* 21 (Da Capo Press 1970) (1932).

[9] Further, as former Attorney General Civiletti has noted, the President refused to comply with the Act of Congress at issue in *Myers v United States,* 272 J S. 52 (1926), and the Solicitor General argued that that Act was unconstitutional. Yet the Court ruled that the President's action in defiance of the statute had been

If the President may properly decline to enforce a law, at least when it uncon-stitutionally encroaches on his powers, then it arguably follows that he may prop-erly *announce* to Congress and to the public that he will not enforce a provision of an enactment he is signing. If so, then a signing statement that challenges what the President determines to be an unconstitutional encroachment on his power, or that announces the President's unwillingness to enforce (or willingness to litigate) such a provision, can be a valid and reasonable exercise of Presidential authority.[10] And indeed, in a recent decision by the United States Court of Appeals for the District of Columbia Circuit, *FEC v. NRA Political Victory Fund*, 6 F.3d 821 (D.C. Cir. 1993), *cert. dismissed*, 513 U.S. 88 (1994), the court cited to and relied upon a Presidential signing statement that had declared that a Congressionally-enacted limitation on the President's constitutional authority to appoint officers of the United States was without legal force or effect. *Id.* at 824-25.

The contrary view — that it is the President's constitutional *duty* not to sign legislation that he believes is unconstitutional — has been advanced on occasion. For example, Secretary of State Thomas Jefferson advised President Washington in 1791 that the veto power "is the shield provided by the constitution to protect against the invasions of the legislature 1. [of] the rights of the Executive 2. of the Judiciary 3. of the states and state legislatures." Opinion on the Constitutionality of the Bill for Establishing a National Bank (Feb. 15, 1791), *reprinted in* 3 *The Founders' Constitution* 247 (Philip B. Kurland & Ralph Lerner eds., 1987). James Madison appears to have held a similar view and as President once vetoed a bill on constitutional grounds even though he supported it as a matter of policy. *See* 2 *A Compilation of the Messages and Papers of the Presidents* 569, 570 (James D. Richardson ed., 1897) ("Messages") (while praising the bill's "beneficial objects," Madison wrote that he "ha[d] no option but to withhold [his] signature from it" because he thought it unconstitutional). Jefferson and Madison, however, did not in fact always act on this understanding of the President's duties: in 1803 Presi-dent Jefferson, with Secretary of State Madison's agreement, signed legislation appropriating funds for the Louisiana Purchase even though Jefferson thought the purchase unconstitutional. *See* 1 William M. Goldsmith, *The Growth of Presiden-*

---

lawful. It gave rise to no actionable claim for damages under the Constitution or an Act of Congress in the Court of Claims . . .

    *Myers* holds that the President's constitutional duty does not require him to execute uncon-stitutional statutes; nor does it require him to execute them provisionally, against the day they are declared unconstitutional by the courts.

4A Op O L.C at 59

[10] Indeed, more broadly, the President may use a signing statement as a vehicle to announce his unwill-ingness to accept a blatantly unconstitutional statute, even if it does not encroach upon his prerogatives, but otherwise violates a constitutional mandate. The executive branch has from time to time challenged Acts of Congress for such reasons for example, it joined the plaintiffs in *United States v Lovett*, 328 U S. 303, 306 (1946), in attacking an unconstitutional bill of attainder, and it intervened in *Simkins v. Moses H Cone Memorial Hosp.*, 211 F. Supp 628, 640 (M.D N C. 1962), *rev'd*, 323 F 2d 959 (4th Cir. 1963), *cert denied*, 376 U S 938 (1964), to contest the constitutionality of an Act of Congress that provided Federal funding for racially segregated hospitals.

*tial Power* 438-50 (1974). In light of our constitutional history, we do not believe that the President is under any duty to veto legislation containing a constitutionally infirm provision, although of course it is entirely appropriate for the President to do so.

## II.

Separate and distinct from all the preceding categories of signing statements, and apparently even more controversial than any of them, is the use of such statements to create legislative (or "executive") history that is expected to be given weight by the courts in ascertaining the meaning of statutory language. *See* Marc N. Garber & Kurt A. Wimmer, *Presidential Signing Statements as Interpretations of Legislative Intent: An Executive Aggrandizement of Power*, 24 Harv. J. on Legis. 363, 366 (1987). Although isolated examples can perhaps be found earlier, signing statements of this kind appear to have originated (and were certainly first widely used) in the Reagan Administration.

In 1986, then-Attorney General Meese entered into an arrangement with the West Publishing Company to have Presidential signing statements published for the first time in the *U.S. Code Congressional and Administrative News*, the standard collection of legislative history. Mr. Meese explained the purpose of the project as follows:

> To make sure that the President's own understanding of what's in a bill is the same . . . or is given consideration at the time of statutory construction later on by a court, we have now arranged with the West Publishing Company that the presidential statement on the signing of a bill will accompany the legislative history from Congress so that all can be available to the court for future construction of what that statute really means.

Address by Attorney General Edwin Meese III, National Press Club, Washington, D.C. (Feb. 25, 1986), *quoted in* Garber and Wimmer, *supra* at 367.

We do not attempt finally to decide here whether signing statements may legitimately be used in the manner described by Attorney General Meese. We believe it would be useful, however, to outline the main arguments for and against such use.

In support of the view that signing statements can be used to create a species of legislative history, it can be argued that the President as a matter both of constitutional right and of political reality plays a critical role in the legislative process. The Constitution prescribes that the President "shall from time to time . . . recommend to [Congress's] Consideration such Measures as he shall judge necessary and expedient." U.S. Const. art. II, § 3, cl. 1. Moreover, before a bill is enacted into law, it must be presented to the President. "If he approve he shall sign it, but if not

he shall return it, with his Objections to that House in which it shall have origi-
nated." U.S. Const. art. I, § 7, cl. 2.[11] Plainly, the Constitution envisages that the
President will be an important actor in the legislative process, whether in originat-
ing bills, in signing them into law, or in vetoing them. Furthermore, for much of
American history the President has *de facto* been "a sort of prime minister or 'third
House of Congress.' . . . [H]e is now expected to make detailed recommendations
in the form of messages and proposed bills, to watch them closely in their tortuous
progress on the floor and in committee in each house, and to use every honorable
means within his power to persuade . . . Congress to give him what he wanted in
the first place." Clinton Rossiter, *The American Presidency* 96 (Johns Hopkins
Press 1987) (1956). It may therefore be appropriate for the President, when sign-
ing legislation, to explain what his (and Congress's) intention was in making the
legislation law, particularly if the Administration has played a significant part in
moving the legislation through Congress. And in fact several courts of appeals
have relied on signing statements when construing legislation. *See United States v.
Story*, 891 F.2d 988, 994 (2d Cir. 1989) (Newman, J.) (citation omitted) ("though
in some circumstances there is room for doubt as to the weight to be accorded a
presidential signing statement in illuminating congressional intent, President Rea-
gan's views are significant here because the Executive Branch participated in the
negotiation of the compromise legislation."); *Berry v. Department of Justice*, 733
F.2d 1343, 1349-50 (9th Cir. 1984) (citing President Johnson's signing statement
on goals of Freedom of Information Act); *Clifton D. Mayhew, Inc. v. Wirtz*, 413
F.2d 658, 661-62 (4th Cir. 1969) (relying on President Truman's description in
signing statement of proper legal standard to be used in Portal-to-Portal Act).

On the other side, it can be argued that the President simply cannot speak for
Congress, which is an independent constitutional actor and which, moreover, is
specifically vested with "[a]ll legislative Powers herein granted." U.S. Const. art.
I, § 1, cl. 1. Congress makes legislative history in committee reports, floor debates
and hearings, and nothing that the President says on the occasion of signing a bill
can reinterpret that record: once an enrolled bill has been attested by the Speaker
of the House and the President of the Senate and has been presented to the Presi-
dent, the legislative record is closed. *See Field v. Clark*, 143 U.S. 649, 672 (1892).
A signing statement purporting to explain the intent of the legislation is, therefore,
entitled at most to the limited consideration accorded to other kinds of post-
passage legislative history, such as later floor statements, testimony or affidavits by
legislators, or amicus briefs filed on behalf of members of Congress. *See Regional
Rail Reorganization Act Cases*, 419 U.S. 102, 132 (1974) (citation omitted) ("post-
passage remarks of legislators, however explicit, cannot serve to change the legis-
lative intent of Congress expressed before the act's passage. Such statements

---

[11] Significantly, the President's veto power is placed in Article I, thereby indicating that he has a share of
the legislative power, rather than in Article II, which deals with the executive power *See* 1 William Cross-
key, *Politics and the Constitution* 419 (1953)

'represent only the personal views of these legislators.'") (quoting *National Woodwork Manufacturers Ass'n v. NLRB*, 386 U.S. 612, 639 n.34 (1967)).[12] Finally, it is arguable that "by reinterpreting those parts of congressionally enacted legislation of which he disapproves, the President exercises unconstitutional line-item veto power." Garber & Wimmer, *supra* at 376; *see also Constitutionality of Line-Item Veto Proposal*, 9 Op. O.L.C. 28, 30 (1985) ("under the system of checks and balances established by the Constitution, the President has the right to approve or reject a piece of legislation, but not to rewrite it or change the bargain struck by Congress in adopting a particular bill").

## Conclusion

Many Presidents have used signing statements to make substantive legal, constitutional or administrative pronouncements on the bill being signed. Although the recent practice of issuing signing statements to create "legislative history" remains controversial, the other uses of Presidential signing statements generally serve legitimate and defensible purposes.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*

---

[12] *But see Seatrain Shipbuilding Corp v Shell Oil Co*, 444 U.S 572, 596 (1980) (according "significant weight" to post-passage statements, particularly "when the precise intent of the enacting Congress is obscure").

## APPENDIX

So far as we have been able to determine, the practice of using presidential signing statements to create legislative history for the use of the courts was uncommon — if indeed it existed at all — before the Reagan and Bush Presidencies. However, earlier Presidents did use signing statements to raise and address the legal or constitutional questions they believed were presented by the legislation they were signing. Examples of signing statements of this kind can be found as early as the Jackson and Tyler Administrations, and later Presidents, including Lincoln, Andrew Johnson, Theodore Roosevelt, Wilson, Franklin Roosevelt, Truman, Eisenhower, Lyndon Johnson, Nixon, Ford and Carter, also engaged in the practice.

According to Louis Fisher of the Congressional Research Service,

> Andrew Jackson sparked a controversy in 1830 when he signed a bill and simultaneously sent to Congress a message that restricted the reach of the statute. The House, which had recessed, was powerless to act on the message. A House report later interpreted his action as constituting, in effect, an item veto of one of the bill's provisions. President Tyler continued the custom by advising the House in 1842 that after signing a bill, he had deposited with the Secretary of State "an exposition of my reasons for giving it my sanction." He expressed misgivings about the constitutionality and policy of the entire act. A select committee of the House issued a spirited protest, claiming that the Constitution gave the President only three options upon receiving a bill: a signature, a veto, or a pocket veto. To sign a bill and add extraneous matter in a separate document could be regarded "in no other light than a defacement of the public records and archives."

Louis Fisher, *Constitutional Conflicts between Congress and the President* 128 (3d rev. ed. 1991) (citations omitted).

President Lincoln stated that he was signing the Confiscation Bill on the understanding that the bill and the joint resolution explaining it were "substantially one." He attached to his signing statement the draft veto message he had prepared before the joint resolution was adopted. In that draft, he raised various objections to the bill, some of which appear to be constitutionally-based. Thus, the draft singled out a provision that "assumes to confer discretionary powers upon the Executive;" but Lincoln stated that he would have "no hesitation to go as far in the direction indicated" even without such legislative authority. 8 *Messages, supra* at 3287; *see also* Norman Small, *Some Presidential Interpretations of the Presidency* 183 (1932).

President Andrew Johnson signed but protested against an Army appropriations bill, claiming that one of its sections "in certain cases virtually deprives the President of his constitutional functions as Commander in Chief of the Army." 8 *Messages, supra* at 3670.

In 1876, when signing a river and harbor appropriations bill that included "many appropriations . . . for works of purely private or local interest, in no sense national," President Grant issued a signing statement saying that "[u]nder no circumstances will I allow expenditures upon works not clearly national." 10 *Messages, supra* at 4331. On the same day, Grant sent the House another signing statement relating to an appropriation for consular and diplomatic services that had in part prescribed the closing of certain consular and diplomatic offices. Grant objected that "[i]n the literal sense of this direction it would be an invasion of the constitutional prerogatives and duty of the Executive," and announced his intention of construing the section as intended merely "to fix a time at which the compensation of certain diplomatic and consular officers shall cease, and not to invade the constitutional rights of the Executive." *Id.* at 4331-32.

President Theodore Roosevelt established several volunteer unpaid commissions to investigate certain factual situations and report back their findings to him. This practice "came to be denounced in Congress as 'unconstitutional,' and an amendment to the Sundry Civil Act of 1909 undertook to forbid the practice. Mr. Roosevelt signed the measure but proclaimed his intention of ignoring the restriction. "'Congress,' he argued, 'cannot prevent the President from seeking advice.'" Edward Corwin, *The President: Office and Powers* 67 (1940) (citation omitted).

President Wilson signed a merchant marine bill in 1920, but determined not to enforce a provision he found unconstitutional. He stated that executing the provision "'would amount to nothing less than the breach or violation'" of some thirty-two treaties. *See* Fisher, *supra* at 130 (quoting 17 *Messages* at 8871-72).

In 1941, President Franklin Roosevelt confided an unpublished Presidential legal opinion objecting to the "two-House veto" provision in the Lend Lease bill to then-Attorney General Robert Jackson. Roosevelt found the provision "clearly unconstitutional," but signed the bill as a matter of diplomatic and political necessity. Robert H. Jackson, *A Presidential Legal Opinion*, 66 Harv. L. Rev. 1353, 1357 (1953). President Roosevelt also signed the Urgent Deficiency Appropriations Act of 1943, which included a section prohibiting the payment of a government salary or other compensation to certain named government employees deemed to be subversive. While signing the bill because it appropriated funds urgently needed to carry on the war, Roosevelt "'plac[ed] on record my view that this provision is not only unwise and discriminatory, but unconstitutional.'" *United States v. Lovett*, 328 U.S. 303, 313 (1946).

President Truman issued a statement on the occasion of signing the General Appropriation Act of 1951 in which he addressed a provision of the bill authorizing loans to Spain. Truman construed the provision in a manner that avoided what

he thought would be an unconstitutional outcome, declaring that "I do not regard this provision as a directive, which would be unconstitutional, but instead as an authorization, in addition to the authority already in existence under which loans to Spain may be made." *Pub. Papers of Harry S. Truman* 616 (1950).

President Eisenhower sought to put a "saving" construction on a 1959 bill amending the Mutual Security Act. He stated that

> I have signed this bill on the express premise that the three amendments relating to disclosure are not intended to alter and cannot alter the recognized Constitutional duty and power of the Executive with respect to the disclosure of information, documents, and other materials. Indeed, any other construction of these amendments would raise grave Constitutional questions under the historic Separation of Powers Doctrine.

*Pub. Papers of Dwight D. Eisenhower* 549 (1959). And in 1960, on the occasion of signing a bill providing for the admission of refugees, Eisenhower noted that "[t]he Attorney General has advised me that there is a serious question as to whether this [one-House veto] provision is constitutional," but declared that "it would be better to defer a determination of the effect of such possible action [i.e., a legislative veto] until it is taken." *Pub. Papers of Dwight D. Eisenhower* 579 (1960-61).

On the occasion of signing the Omnibus Crime Control and Safe Streets Act of 1968, President Lyndon Johnson criticized as "vague and ambiguous" certain provisions dealing with Federal rules of evidence in criminal cases, but stated that the Attorney General had advised him that those provisions could "be interpreted in harmony with the Constitution, and Federal practices in this field [e.g., the Federal Bureau of Investigation's practice of warning suspects of their constitutional rights] will continue to conform to the Constitution." 1 *Pub. Papers of Lyndon B. Johnson* 727 (1968-69).

President Nixon signed a 1971 military authorization bill, but objected to a provision in it (the Mansfield Amendment, which set a final date for the withdrawal of U.S. Forces from Indochina) as being "without binding force or effect." *Pub. Papers of Richard Nixon* 1114 (1971).

President Ford, upon signing the Defense Appropriation, 1976, objected to a provision of that bill that restricted the Executive's ability to obligate funds for certain purposes until it received approval from several Congressional committees. Ford stated that he could not "concur in this legislative encroachment," and that consequently he would treat the restriction "as a complete nullity." 1 *Pub. Papers of Gerald R. Ford* 242 (1976-77).

President Carter issued several signing statements, including statements on the FY 1980-81 Department of State Appropriations Act, the FY 1981 Department of

Defense Authorization Act and the International Security and Development Cooperation Act of 1980. The first of these cases was a bill which, like the 1876 bill President Grant had objected to but signed, purported to mandate the closing of certain consular posts. Carter objected that Congress "cannot mandate the establishment of consular relations at a time and place unacceptable to the President," and accordingly stated his determination to construe the provision as merely precatory. 2 *Pub. Papers of Jimmy Carter* 1434 (1979).

As noted above, the Reagan and Bush Administrations made frequent use of Presidential signing statements, not only to declare their understanding of the constitutional effect of the statutory language, but also to create evidence on which the courts could rely in construing such language. *See, e.g.*, President's Statement on Signing S. 1200 Into Law, 22 Weekly Comp. Pres. Doc. 1534, 1536 (Nov. 6, 1986) (interpreting language of Immigration Reform and Control Act); President's Statement on Signing S. 124 Into Law, 22 Weekly Comp. Pres. Doc. 831, 832 (June 19, 1986) (interpreting language of Safe Drinking Water Act); *Issues Raised by Foreign Relations Authorization Bill*, 14 Op. O.L.C. 37 (1990) (provision of foreign relations authorization bill unconstitutionally infringed on President's authority to conduct negotiations; if President chose to sign bill, he would be entitled not to enforce provision); *Appointments to the Commission on the Bicentennial of the Constitution*, 8 Op. O.L.C. 200, 201-02 (1984) (discussing Senator Hatch's objections to constitutional claims made by President Reagan's signing statement on bill).