# Administration of the Ronald Reagan Centennial Commission

The Ronald Reagan Centennial Commission should create an executive committee, composed of its five presidentially appointed members, to discharge the purely executive functions of the Commission.

The six congressional members, in turn, could participate in nearly all of the Commission's activities, including in ceremonial functions, and could advise the executive committee on the formulation of programs that would be technically approved and executed by non-congressional members.

May 7, 2010

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

You have forwarded to our Office a letter from four of the presidentially appointed members of the Ronald Reagan Centennial Commission, in which they request advice on a plan they have developed in order to avoid the constitutional concerns raised by the composition of the Commission under the Ronald Reagan Centennial Commission Act of 2009, Pub. L. No. 111-25, 123 Stat. 1767 (the "Act"). *See* Letter for Robert Bauer, Counsel to the President, from Peggy Noonan, John F.W. Rogers, Frederick J. Ryan Jr., and Fred W. Smith, *Re: Operation of the Ronald Reagan Centennial Commission* (Mar. 11, 2010) ("March 11 Letter"). Under this plan, four of the presidentially appointed members of the Commission, and all six congressional members, would vote to delegate to the one other presidentially appointed member the responsibility to exercise the Commission's duties under section 3(1) of the Act. The remaining ten members would then be limited to advisory and ceremonial functions, and the eleventh, designated member would exercise all of the Commission's significant executive responsibilities. *See* Memorandum on Implementation of the Ronald Reagan Centennial Commission Act ("Implementation Memo") at 3 (attached to March 11 Letter). You have asked for our views of this proposal.

The proposal, at least in spirit if not in letter, well addresses the concerns that we previously identified. We believe, however, that the precise form of the proposed solution requires some refinement in order to ensure it conforms to the constitutional understandings on which it appears to be premised and to avoid a potential statutory problem. Thus,

we conclude that the Commission should instead follow the recommendation this Office offered in a very similar context in its 1984 opinion on *Appointments to the Commission on the Bicentennial of the Constitution*—namely, to create an "executive committee," composed of the five presidentially appointed members, which "would be legally responsible for discharging the purely executive functions of the Commission." 8 Op. O.L.C. 200, 207 (1984) ("*Constitution Bicentennial Commission*"). These functions would include determining which activities would be "fitting and proper to honor Ronald Reagan on the occasion of the 100th anniversary of his birth" and "plan[ning], develop[ing], and carry[ing] out" such activities. Pub. L. No. 111-25, § 3(1). The six congressional members, in turn, could "participate in nearly all of the Commission's activities," including in ceremonial functions, and could advise the executive committee on "the formulation of programs that would be technically approved and executed by non-congressional members." *Constitution Bicentennial Commission*, 8 Op. O.L.C. at 207. At the end of this memorandum, we briefly explain why this recommendation could be implemented in a manner that would not violate the constitutional holding in *FEC v. NRA Political Victory Fund*, 6 F.3d 821 (D.C. Cir. 1993).

## I.

The Ronald Reagan Centennial Commission Act created an eleven-member commission with responsibility to "plan, develop, and carry out such activities as the Commission considers fitting and proper to honor Ronald Reagan on the occasion of the 100th anniversary of his birth." Pub. L. No. 111-25, § 3(1). Six of the eleven commissioners are members of Congress, appointed by congressional leadership. *Id.* § 4(a). Four commissioners are appointed by the President, and the remaining commissioner is the Secretary of the Interior. *Id.*

As we explained in a memorandum concerning the constitutionality of the bill before Congress enacted it, the inclusion of members of Congress raises significant concerns under the Appointments Clause and the Ineligibility Clause of the Constitution, and in light of the anti-aggrandizement principle underlying the constitutional separation of powers. *See Participation of Members of Congress in the Ronald Reagan Centennial Commission*, 33 Op. O.L.C. 193 (2009) ("*Reagan Centennial Commission*").

To ameliorate these concerns, we suggested that the bill be amended to provide for designation of an executive branch official as the officer responsible for considering the advice and recommendations of the commissioners and then "planning, developing and carrying out" the ceremonial events. Congress did not make any such amendment, however. Therefore, when he signed the bill into law President Obama stated that, in order to implement the Act in a constitutional manner, "members of Congress 'w[ould] be able to participate only in ceremonial or advisory functions of [the] Commission, and not in matters involving the administration of the act.'" *Statement on Signing the Ronald Reagan Centennial Commission Act*, 2009 Daily Comp. Pres. Doc. No. 424, at 1 (June 2, 2009) (quoting *Statement on Signing the Bill Establishing a Commission on the Bicentennial of the United States Constitution* (Sept. 29, 1983), 2 Pub. Papers of Pres. Ronald Reagan 1390, 1390 (1983)).

Four of the five presidentially appointed commissioners (all except the Secretary of the Interior) have proposed the following plan to avoid the constitutional problems we previously identified:

> First, all Commissioners save one Presidentially appointed Commissioner would elect—subject to their statutory rights—not to exercise the powers set forth in § 3(1) of the Act. Second, the Commission would carry out its planning and other functions up to the point of execution, and then create a final plan in the form of a resolution. Third, the Commission would transmit this resolution to the Presidentially appointed member of the Commission who would be designated to exercise the § 3(1) power. That designated Commissioner would evaluate and potentially execute the resolution as an Officer of the United States.

Implementation Memo at 3.

## II.

This proposal raises the following constitutional concern. The six congressional members, along with four of the five presidentially appointed members, would vote to delegate statutory duties to the remaining presidentially appointed commissioner. Those duties would include all of the statutory duties of the Commission, including those that may constitution-

ally be exercised only by Commission members who were presidentially appointed. The congressional members lack the authority to exercise the significant executive authority that, under the proposal, they would purport to confer on another member of the Commission.

To avoid this anomaly, and to reflect the allocation of authority the Constitution requires, we believe the Commission should follow the recommendation this Office offered in a comparable context in 1984, *see Constitution Bicentennial Commission*, 8 Op. O.L.C. 200—namely, "to create an executive committee composed of all [five of the Commission members who are constitutionally eligible to exercise the duties of the Commission] that would be legally responsible for discharging the purely executive functions of the Commission," *id*. at 207—including, in particular, determining which activities would be "fitting and proper to honor Ronald Reagan on the occasion of the 100th anniversary of his birth," Pub. L. No. 111-25, § 3(1), and giving final approval to all executive actions. The six congressional members, in turn, could "participate in nearly all of the Commission's activities," could perform ceremonial functions, and could advise the executive committee as to all of its functions, including "the formulation of programs that would be technically approved and executed by non-congressional members." *Constitution Bicentennial Commission*, 8 Op. O.L.C. at 207. Moreover, under this approach the entire Commission, including the congressionally appointed members, could also "provide advice and assistance to Federal, State, and local governmental agencies, as well as civic groups to carry out activities to honor Ronald Reagan on the occasion of the 100th anniversary of his birth," as section 3(2) of the Act authorizes, since such functions do not raise the constitutional problems we have identified.

We do not think that the Commission's establishment of such an "executive committee" would present the problem identified above. Consistent with the President's signing statement, and in order to avoid serious constitutional questions, we would construe the Act *already* to limit the exercise of "the purely executive functions of the Commission," *Constitution Bicentennial Commission*, 8 Op. O.L.C. at 207, to the five presidentially appointed commissioners who would constitute the "executive committee." *Cf.* 58 Fed. Reg. 59,640 (Nov. 10, 1993) (reporting that four days after a court of appeals had held that the presence of two *ex officio* congressional appointees on the Federal Election Commission was

unconstitutional, the FEC "reconstituted itself as a body of six voting members"). Thus, there would be no purported "delegation" of significant authority from congressionally appointed officers to presidentially appointed ones. This formal distinction, while effectively resulting in the same allocation of functions to the congressional members as in the proposal in the Implementation Memo submitted to you, would not present the constitutional infirmities we discussed in our earlier memorandum, or the anomaly described above. Instead, an executive committee would simply exercise those functions that may be properly exercised only by the presidentially appointed officers.

Moreover, because this course would involve no delegation of statutory authority within the Commission, it would also avoid a potentially serious statutory problem. The members' proposal would call for a delegation of the Commission's statutory duties to a single member. Particularly in light of section 4(h) of the Act, which provides that "[a] majority of the members of the Commission shall constitute a quorum to conduct business, but two or more members may hold hearings," and the fact that the statute contains neither a specific authority to delegate powers to Commission members, *see R.R. Yardmasters of Am. v. Harris*, 721 F.2d 1332, 1334 (D.C. Cir. 1983) (citing 45 U.S.C. § 154 (1976)), nor a general rulemaking authority from which certain delegation authorities might be inferred, *see Fleming v. Mohawk Wrecking & Lumber Co.*, 331 U.S. 111, 121 (1947), we do not see any obvious source of authority for the Commission to delegate its powers to a subset (or one) of its members. That is another reason why the better course would be for the Commission to create an "executive committee," consisting of the five presidentially appointed members, to exercise the Commission's statutory authorities. Were the executive committee to consist of fewer than five members, it would raise the issue of the statutory authority of the presidentially appointed members to delegate some of their significant executive authority to that smaller group. But so long as the executive committee consists of all members entitled to exercise significant executive authority under the Constitution, there would be no delegation of Commission duties and thus no statutory problem.

### III.

Finally, the members who sent you the March 11 Letter appear to be concerned (*see* Implementation Memo at 2) that adopting the "executive committee" solution from our 1984 opinion could run afoul of *FEC v. NRA Political Victory Fund*, 6 F.3d 821 (D.C. Cir. 1993). The court in that case declared invalid a section of the Federal Election Campaign Act, 2 U.S.C. § 437c(a)(1), which provided that the Secretary of the Senate and Clerk of the House or their designees were to be members of the Federal Election Commission "ex officio and without the right to vote." The FEC had argued that the presence of those members was constitutionally harmless because their only formal role was informational and advisory. The court rejected this argument, reasoning that "the mere presence of agents of Congress on an entity with executive powers offends the Constitution." 6 F.3d at 827; *see also Reagan Centennial Commission*, 33 Op. O.L.C. at 199 & n.8.

But this case would be distinguishable in important respects from *NRA Political Victory Fund*. As the United States explained in its brief to the Supreme Court in that case, the statute at issue there compelled the FEC "to afford the Secretary and Clerk an integral role in all its deliberative processes. By participating as members in the FEC's deliberations, the *ex officio* agents give Congress the ability to express its views from within the Commission on issues involving the execution and administration of the FECA in specific cases and instances." Brief for the United States as Amicus Curiae at 18–19, *FEC v. NRA Political Victory Fund*, 513 U.S. 88 (1994); *see also id.* at 20–21 (warning about the "lack of confidentiality" and explaining that "[t]he prospect that these congressional employees will report on FEC proceedings to Congress may cause the other members to 'temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process'") (quoting *United States v. Nixon*, 418 U.S. 683, 705 (1974)); *NRA Political Victory Fund*, 6 F.3d at 827 (reasoning that entitling congressional agents to be present during the confidential deliberations of the executive officials was analogous to the compelled presence of nonvoting alternate jurors during jury deliberations); Harold H. Bruff, *The Incompatibility Principle*, 59 Admin. L. Rev. 225, 255–56 (2007) ("Although Congress opened many of the deliberations of multi-member agencies like the FEC to public view

through the Sunshine Act, the Act contains exceptions allowing confidential discussions, which would lose much of their efficacy if congressional monitors were present for discussions among the Commissioners. . . . The values underlying both executive privilege and the incompatibility principle suggest the need for some zone of privacy for executive deliberation." (footnote omitted)).

The Ronald Reagan Centennial Commission, by contrast, could implement our 1984 recommendation in a manner that does not raise these concerns: The executive committee would simply choose to consult with and receive advice from those members not serving on the executive committee. Here, the executive committee alone would be responsible for exercising significant executive authority, and no one other than the presidentially appointed officers would be serving on that decision-making body, thereby distinguishing this case from *NRA Political Victory Fund*, in which the congressional agents were ex officio members of a commission that was required to deliberate as a whole on its decisions. In *NRA Political Victory Fund*, the congressional agents did not serve on a body in which the decisional and advisory functions were segregated in the manner that our 1984 memorandum suggested and that we recommend to be the proper course here. Moreover, absent the particular problem present in *NRA Political Victory Fund*, there is nothing constitutionally problematic about members of Congress offering advice designed to influence executive action, as the court in *NRA Political Victory Fund* itself acknowledged. 6 F.3d at 827 (Congress "enjoys ample channels to advise, coordinate, and even directly influence an executive agency," including by "direct communication with the [agency]"); *see also Mistretta v. United States*, 488 U.S. 361, 408 (1989) (the Constitution "anticipates that the coordinate Branches will converse with each other on matters of vital common interest").

MARTIN S. LEDERMAN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*