36 F.3d 97
 308 U.S.App.D.C. 283
 John W. HECHINGER, Jr.; Craig H. Baab; Citizens for the
Abatement of Aircraft Noise, Inc., Appellees,
United States of America, Intervenor for Appellee,
v.
METROPOLITAN WASHINGTON AIRPORTS AUTHORITY; Board of
Review, Appellants.
 No. 94-7036.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 19, 1994.
Decided Sept. 27, 1994.
 
 William T. Coleman, Jr., with whom Donald T. Bliss, Debra A. Valentine, and Matthew B. Pachman were on the briefs, for appellants.
 Patti A. Goldman, with whom Alan B. Morrison was on the brief, for appellees.
 Douglas Letter, Atty., U.S. Dept. of Justice, with whom Frank W. Hunger, Asst. Atty. Gen., and Eric H. Holder, Jr., U.S. Atty., were on the brief, for intervenor U.S.
 Before BUCKLEY, WILLIAMS, and ROGERS, Circuit Judges.
 Opinion for the court filed by Circuit Judge BUCKLEY.
 BUCKLEY, Circuit Judge:
 
 
 1
 The Metropolitan Washington Airports Authority operates the Washington National and Dulles International Airports under lease from the Federal Government and is required by statute to submit certain actions to a Board of Review before they may take effect. As originally enacted, the statute stipulated that the Board be composed entirely of Members of Congress and gave it the power to veto the Authority's actions. In 1991, the Supreme Court held that the Board was an agent of Congress and that it exercised federal power in violation of the doctrine of the separation of powers. The Court's decision was based in significant degree on the Board's mandatory congressional membership and its veto power. Although Congress has since amended the statute to eliminate these provisions, we conclude that the amendments impose other qualifications for Board membership and have vested the Board with other powers that, together, continue to offend the Constitution.
 
 I. BACKGROUND
 
 2
 In 1987, the Secretary of Transportation entered into a long-term lease of the Washington National and Dulles International Airports to the Metropolitan Washington Airports Authority ("Authority"), an independent regional authority that had been created two years earlier by compact between the Commonwealth of Virginia and the District of Columbia. Prior to that time, the two airports had been operated by the Federal Government.
 
 
 3
 The lease was authorized by the Metropolitan Washington Airports Act of 1986 ("Transfer Act") (codified as amended at 49 U.S.C.App. Secs. 2451-2461 (1988 & Supp. III 1991)). Congress conditioned the lease on the Authority's establishment of a Board of Review ("Board") consisting of nine Members of Congress. Id. Sec. 2456(f)(1) (1988) (superseded); Metropolitan Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc., 501 U.S. 252, 259, 111 S.Ct. 2298, 2303, 115 L.Ed.2d 236 (1991) ("CAAN"). Under the congressional scheme, the Authority was required to submit the following actions for the Board's consideration at least 30 calendar days before they were to become effective (60 days in the case of the annual budget):
 
 
 4
 (i) the adoption of an annual budget;
 
 
 5
 (ii) the authorization for the issuance of bonds;
 
 
 6
 (iii) the adoption, amendment, or repeal of a regulation;
 
 
 7
 (iv) the adoption or revision of a master plan, including any proposal for land acquisition; and
 
 
 8
 (v) the appointment of the chief executive officer.
 
 
 9
 49 U.S.C.App. Sec. 2456(f)(4)(B) (1988) (superseded). If the Board did not disapprove an action within 30 days, it could take effect. 49 U.S.C.App. Sec. 2456(f)(4)(C) (1988) (superseded).
 
 
 10
 On June 17, 1991, the Supreme Court ruled that the Board was vested with power that violated the constitutional doctrine of the separation of powers. CAAN, 501 U.S. at 275-76, 111 S.Ct. at 2312 (1991) (affirming judgment in Citizens for the Abatement of Aircraft Noise, Inc. v. Metropolitan Washington Airports Auth., 917 F.2d 48 (D.C.Cir.1990)). Within six months, Congress enacted amendments to the Transfer Act ("1991 Amendments" or "Amendments") that effected major changes in the composition and powers of the Board.
 
 
 11
 We begin with the first. As originally enacted, the Transfer Act required that the nine members of the Board be Members of Congress, of whom eight had to be members of specified congressional committees having jurisdiction over transportation issues. The Board members were to be chosen from lists furnished by the Speaker of the House and the President pro tempore of the Senate. 49 U.S.C.App. Sec. 2456(f)(1) (1988) (superseded). The Supreme Court noted the following problems with this arrangement:
 
 
 12
 The list system, combined with congressional authority over committee assignments, guarantees Congress effective control over appointments. Control over committee assignments also gives Congress effective removal power over Board members because depriving a Board member of membership in the relevant committees deprives the member of authority to sit on the Board.
 
 
 13
 CAAN, 501 U.S. at 269, 111 S.Ct. at 2308. After this admonishment, Congress revised the composition of the Board to require that
 
 
 14
 [m]embers of the Board of Review shall be individuals who have experience in aviation matters and in addressing the needs of airport users and who themselves are frequent users of the Metropolitan Washington Airports. A member of the Board of Review shall be a registered voter of a State other than Maryland, Virginia, or the District of Columbia.
 
 
 15
 49 U.S.C.App. Sec. 2456(f)(2)(C). While the Authority's Board of Directors ("Directors") continues to appoint the members of the Board of Review and now has the power to remove members for cause, id. Sec. 2456(f)(11), the Directors are still confined to the lists of nominees submitted by the Speaker and the President pro tempore. Id. Sec. 2456(f)(1).
 
 
 16
 The 1991 Amendments also redefined the powers of the Board. While they eliminated the Board's veto authority, they expanded its other powers in a number of significant ways. The Amendments extended the list of actions requiring Board review to include "the award of a contract ... which has been approved by the board of directors of the Airports Authority" as well as "any action of the board of directors approving a terminal design or airport layout or modification of such design or layout[,]" 49 U.S.C.App. Sec. 2456(f)(4)(B) (Supp. III 1991), and authorized members of the Board to participate in, but not vote at, meetings of the Directors. Id. Sec. 2456(f)(7). The Amendments also made substantial changes in the review process, including a grant to the Board of the authority to make recommendations regarding actions submitted for its review, id. Sec. 2456(f)(4)(C), such actions to be referred to Congress for its further review if the Directors fail to adopt the Board's recommendations. Id. Sec. 2456(f)(4)(D)(ii).
 
 
 17
 Specifically, the amended Transfer Act provides that the Board may, within 30 calendar days or 10 "legislative days" of its submission, whichever is longer, present to the Directors a recommendation concerning a proposed action. Id. Sec. 2456(f)(4)(C). Legislative days are calculated by
 
 
 18
 excluding Saturdays, Sundays, and holidays, and any day on which neither House of Congress is in session because of an adjournment sine die, a recess of more than 3 days, or an adjournment of more than 3 days....
 
 
 19
 Id. If no recommendation is made during that period, or if the Board decides it will make no recommendation before the period elapses, the Directors' proposal may take effect. Id.
 
 
 20
 Similarly, if the Board makes a recommendation and the Directors adopt it, the revised proposal may go into effect immediately. Id. Sec. 2456(f)(4)(D)(i). If the Directors do not adopt the Board's recommendation, the Directors must submit a detailed description of the proposed action, the Board's recommendation, and the Directors' evaluation and response to the recommendation to the Speaker of the House and the President of the Senate for a review period of 60 legislative days. Id. Sec. 2456(f)(4)(D)(ii). If Congress does not pass a joint resolution of disapproval within this period, the Directors' proposed action may take effect. Id. Sec. 2456(f)(4)(D)(i), (5)(B).
 
 
 21
 Among the features of the original Act that have been retained are the Board's authority to "request the ... Authority to consider and vote, or to report, on any matter related to" the Dulles or National Airports, to which the Authority must comply "as promptly as feasible," id. Sec. 2456(f)(6), and what may be described as the 1986 Act's "drop-dead" clause. It provides that if the Board of Review
 
 
 22
 is unable to carry out its functions under this subchapter by reason of a judicial order, the Airports Authority thereafter shall have no authority to perform any of the actions that are required ... to be submitted to the Board of Review.
 
 
 23
 Id. Sec. 2456(h).
 
 
 24
 On cross-motions for summary judgment, U.S. District Judge Joyce Hens Green concluded that the Board of Review was an agent of Congress that exercised federal power, Hechinger v. Metropolitan Washington Airports Auth., 845 F.Supp. 902, 907 (D.D.C.1994), and held that the amended Act was unconstitutional in that it permitted the Board to exercise impermissible control over the Authority. Id. at 908. Judge Green also held that the members of the Board were selected in a manner that violated the Constitution's Appointments Clause. Id. at 908-09. As we agree that the Board is a congressional agent that exercises significant federal power in violation of separation-of-powers principles, we do not address the latter ruling.
 
 II. ANALYSIS
 
 25
 A. Is the Board of Review an Agent of Congress?
 
 
 26
 Following the approach adopted by the Supreme Court in CAAN, 501 U.S. at 264-70, 111 S.Ct. at 2306-09, we first determine whether the Board is an agent of Congress. No single factor is dispositive. Among the factors considered by the CAAN Court were the conditioning of the lease of the two airports on the Authority's creation of the Board of Review, the presence of the drop-dead clause, the Federal Government's
 
 
 27
 strong and continuing interest in the efficient operation of the airports ... [which] motivated the creation of the Board of Review, ... [and] [m]ost significant, [that] membership on the Board of Review [was] limited to federal officials, specifically members of congressional committees charged with authority over air transportation.
 
 
 28
 CAAN, 501 U.S. at 266-67, 111 S.Ct. at 2307. The Court concluded:
 
 
 29
 We thus confront an entity created at the initiative of Congress, the powers of which Congress has delineated, the purpose of which is to protect an acknowledged federal interest, and membership in which is restricted to congressional officials. Such an entity necessarily exercises sufficient federal power as an agent of Congress to mandate separation-of-powers scrutiny.
 
 
 30
 Id. at 269, 111 S.Ct. at 2308.
 
 
 31
 As amended, the Transfer Act presents us with the same entity, although devoid of the explicit membership restrictions. The new Board and its powers continue to be the creation of Congress, the drop-dead provision remains in place, and the federal interest in the efficient operation of the two airports continues unchanged. The question, then, is whether erasing the condition that the Board's membership be limited to Members of Congress, eight of whom sit on specified congressional committees, while requiring the Authority to select members from lists prepared by the Speaker of the House and the President pro tempore of the Senate, suffices to eliminate the Board's status as an agent of Congress and thus immunizes the amended Act from separation-of-powers review.
 
 
 32
 It is true that the Court found the original membership condition "[m]ost significant." Id. at 266-67, 111 S.Ct. at 2307. Yet this condition was but one of "[s]everal factors combin[ing]" to warrant separation-of-powers analysis, id. at 264-66, 111 S.Ct. at 2306-07. Its elimination, then, does not end our inquiry. Indeed, the Court specifically called for a functional approach, reminding us that " 'separation-of-powers analysis does not turn on the labeling of an activity.' " Id. at 267, 111 S.Ct. at 2307 (quoting Mistretta v. United States, 488 U.S. 361, 393, 109 S.Ct. 647, 666, 102 L.Ed.2d 714 (1989)).
 
 
 33
 To this end, we look to the revised provisions establishing the Board. Its members must be: (1) frequent users of the Metropolitan Washington Airports; (2) registered voters of a State other than Maryland, Virginia, or the District of Columbia; and (3) experienced in aviation matters and in addressing the needs of airport users. 49 U.S.C. app. Sec. 2456(f)(2)(C). Hechinger maintains that these qualifications are met by Members of Congress who serve on the relevant oversight committees, thus assuring their domination of the Board. Similarly, the United States, an intervenor, argues that the district court correctly concluded that the new requirements for Board membership "ensured that many members of Congress--and few others--will be eligible to serve on the Board of Review." Hechinger, 845 F.Supp. at 907. The Authority responds that these requirements do not compel the selection of a Member of Congress but merely ensure that the Board will provide nationwide users with informed representation.
 
 
 34
 While it is true that Board membership is no longer limited to Representatives and Senators who sit on committees that have jurisdiction over air transportation, as a practical matter, relatively few individuals other than members or alumni of those committees will be able to meet the new criteria. Thus it is hardly happenstance that of the nine members appointed to the Board following adoption of the 1991 Amendments, eight were Members of Congress who served on committees having jurisdiction over air transportation--the lone outsider being a former Secretary of Transportation. Cf. C & A Carbone, Inc. v. Town of Clarkstown, --- U.S. ----, ----, 114 S.Ct. 1677, 1684, 128 L.Ed.2d 399 (1994) (Court looks beyond "explicit terms" of facially neutral local ordinance to its "practical effect and design.").
 
 
 35
 We are also struck by Congress's choice of the period within which the Board must make its recommendations: the longer of 30 calendar days or 10 legislative days. Again, it is not happenstance that computation of the latter requires the exclusion of those days on which Representatives and Senators may be expected to be out of town; namely, the week-ends, holidays, and congressional adjournments and recesses when they are free to work in their respective constituencies. Id. Sec. 2546(f)(4)(C). There can be no reason for such a provision other than to serve the convenience of the Members of Congress who were expected to serve on the Board.
 
 
 36
 Finally, we examine the manner in which the members of the Board are selected. While they are no longer required to be Members of Congress, and while they may now be removed for cause by the Directors, id. Sec. 2456(f)(11), they must still be nominated by the Speaker of the House or the President pro tempore of the Senate. Id. Sec. 2456(f)(1). It is true that the Directors may request that additional names be submitted, id. Sec. 2456(f)(1), but we have little doubt who would win a test of wills because the 1991 Amendments also provide that at any time that the Board
 
 
 37
 has more than 4 vacancies and lists have been provided for appointments to fill such vacancies, the Airports Authority shall have no authority to perform any of the actions that [must] be submitted to the Board of Review.
 
 
 38
 Id. Sec. 2456(f)(2)(D).
 
 
 39
 In CAAN, the Supreme Court found it significant that "appointments must be made from the lists, and there is no requirement that the lists contain more recommendations than the number of Board openings." 501 U.S. at 268-69, 111 S.Ct. at 2308 (emphasis in original). This remains true of the amended Act. Because the Directors may never go outside the lists furnished by the Speaker and the President pro tempore, we conclude that Congress retains control over the appointments. This control, together with the provisions that in practice ensure that the Board will be dominated by Members of Congress, persuades us that Congress intended the Board to serve, and we hold that it does serve, as its agent.
 
 
 40
 B. Does the Board of Review Exercise Federal Power?
 
 
 41
 In order to determine the nature of the power exercised by the new Board, it is necessary to understand the practical consequences of its ability to delay actions that are contemplated by the Authority. Under the Transfer Act, the Board has the longer of 30 days or 10 legislative days within which to review certain actions proposed by the Directors. 49 U.S.C.App. Sec. 2456(f)(4)(C); see also id. Sec. 2456(f)(4)(B) (listing actions). The Board may let the proposal go into effect by allowing the waiting period to lapse, may "decide[ ] it will not make a recommendation on an action" (thereby allowing it to go into effect immediately), or may make recommendations regarding the action, including one that it not take effect. Id. Sec. 2456(f)(4)(C). If recommendations are made and the Directors adopt them, the proposal may go into effect immediately, id. Sec. 2456(f)(4)(D)(i); if the recommendations are not adopted, they must be transmitted, along with "a detailed description of the action ... and the evaluation and response of the board of directors to [the Board of Review's] recommendation[s]," to Congress for a 60-legislative-day review period. Id. Sec. 2456(f)(4)(D)(ii).
 
 
 42
 The Authority argues that because the Board has lost its right of veto and may only make recommendations, it has been stripped of power and serves solely in an advisory capacity. Yet the Board's loss of its veto power does not necessarily mean that it has lost the effective control over the Authority that the Supreme Court found to be an unconstitutional exercise of federal power. See CAAN, 501 U.S. at 268-70, 275-77, 111 S.Ct. at 2308, 2312. We must therefore examine the potential impact of the Board's remaining authority on the Directors' decisionmaking. To this end, we examine the various ways in which the Board is able to affect the substance of the Authority's actions.
 
 
 43
 First, the Board may request the Authority "to consider and vote, or to report, on any matter related" to the two airports; and the Authority must do so "as promptly as feasible." Id. Sec. 2456(f)(6). The Board thus has the ability to force any issue it wishes onto the Authority's agenda for priority consideration.
 
 
 44
 Second, members of the Board may participate as non-voting members in meetings of the Directors. Id. Sec. 2456(f)(7). To paraphrase our comment in Federal Election Comm'n v. NRA Political Victory Fund, 6 F.3d 821 (D.C.Cir.1993), cert. granted, --- U.S. ----, 114 S.Ct. 2703, 129 L.Ed.2d 832 (June 20, 1994), in which we invalidated an arrangement whereby Congress appointed two of its agents as non-voting ex officio members of the Federal Election Commission, "we cannot conceive why Congress would wish [members of the Board of Review to participate in meetings of the Directors] if not to exercise some influence." See id. at 826 (emphasis in original). Even if the members "were to remain completely silent during all deliberations (a rather unlikely scenario), their mere presence as agents of Congress [would] convey [ ] a tacit message to the [Directors]." Id. at 826. We held, in that case, that "the mere presence of agents of Congress on an entity with executive powers offends the Constitution." Id. at 827. Although members of the Board may not vote at meetings of the Directors, they may attend them; they may place items on the agenda for the Directors' priority consideration; and they are free to express their views on proposed actions before the Directors have made the formal decisions that must then be submitted to the Board for its consideration. This arrangement raises the same concerns that underpinned our decision in NRA Political Victory Fund: "Advice ... surely implies influence, and Congress must limit the exercise of its influence, whether in the form of advice or not, to its legislative role." Id.
 
 
 45
 Finally, and most significantly, the Board has the discretion to accelerate the implementation of a Directors' decision by promptly approving it or consigning it to the delays and uncertainties of a congressional review. The Authority argues that the Transfer Act's review requirements are nothing more than variations on legitimate "report-and-wait" provisions to be found in other statutes. These typically require that a federal agency's proposed actions be referred to Congress for a period that is long enough to permit them to be studied and, if found wanting, to allow for the passage of a joint resolution of disapproval. See, e.g., Sibbach v. Wilson & Co., Inc., 312 U.S. 1, 15, 61 S.Ct. 422, 427, 85 L.Ed. 479 (1941) (report-and-wait provision allowing Congress to review the Federal Rules of Civil Procedure and "veto their going into effect if contrary to the policy of the legislature"); Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 689-90, 107 S.Ct. 1476, 1482-83, 94 L.Ed.2d 661 (1987) (provision requiring Secretary of Labor to refer certain proposed regulations to transportation committees of both Houses of Congress).
 
 
 46
 Hechinger concedes that Congress could have constitutionally required that all the Directors' proposed actions be submitted to Congress for a period of review before taking effect. But Congress has vested the Board with a substantive role that distinguishes this case from the "report-and-wait" cases on which the Authority relies. The provisions in those cases require automatic referral of particular decisions to Congress; thus their effect on the referring party's decisionmaking is neutral. Here, by contrast, the Board has the ability to decide whether action taken by the Directors will be allowed to take immediate effect or be subjected to a 60-statutory-day congressional review. It is this discretion that provides the Board its leverage.
 
 
 47
 The Authority nevertheless sees an analogy between the Board's power to delay the effective date of Authority actions and that of the Comptroller General to stay the award of contracts under the Competition in Contracting Act of 1984, 31 U.S.C. Secs. 3551-3556 (1988) ("CICA"), which two circuit courts have upheld. See Ameron, Inc. v. United States Army Corps of Eng'rs, 809 F.2d 979 (3d Cir.1986); Lear Siegler, Inc., Energy Prods. Div. v. Lehman, 842 F.2d 1102 (1988), irrelevant portion withdrawn en banc, 893 F.2d 205 (9th Cir.1989). CICA authorizes the Comptroller General to investigate complaints that a federal agency has solicited bids or awarded a contract in violation of the law. If the Comptroller General notifies an agency that a rejected bidder has filed a protest, the award of the contract is automatically stayed pending an investigation of the disputed bidder's charges. 31 U.S.C. Sec. 3553(c)(1). The Comptroller General may take up to 90 working days to conduct the investigation but may dismiss the protest before they have expired (thereby lifting the stay) if he finds it to be frivolous or facially invalid. Id. Sec. 3554(a)(1), (3). On the other hand, the stay may be overridden by
 
 
 48
 [t]he head of the procuring activity responsible for award of a contract ... upon a written finding ... that urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General....
 
 
 49
 Id. Sec. 3553(d)(2)(A)(ii). If the Comptroller General finds a breach of the laws governing the solicitation or award of government contracts, he must make appropriate recommendations to the agency, id. Sec. 3554(b)(1); and if these are not implemented, he must record the pertinent information in a report he is required to submit to Congress on an annual basis. Id. Sec. 3554(e)(2).
 
 
 50
 In Ameron, the Third Circuit concluded that the Comptroller General's ability to shorten the 90-day stay provision might well cause procurement officials to "exercise their discretion in ways which are not required by the procurement laws, and which they would not otherwise have chosen, in order to minimize conflict with the Comptroller General." It found, however, that "any potential disruption of the executive function [was] minimal." Ameron, 809 F.2d at 997. The Ninth Circuit's analysis was similar:
 
 
 51
 [T]he proper inquiry is not whether a legislative agent can temporarily "bind" or "directly affect" parties outside the legislative branch, but rather whether the legislative agent exercises control or ultimate authority in the disposition of a particular issue. It is clear that the stay provisions do not establish such control. As noted above, the stay is temporary, usually 90 working days or less. Because the recommendations of the Comptroller General are non-binding, the stay cannot be used to coerce the procuring agency to make a particular final disposition; rather the stay provisions force nothing more than a dialogue between the procuring agency and the legislature.
 
 
 52
 Lear, 842 F.2d at 1110 (emphasis in original). The Ninth Circuit stressed that the imposition of a stay was initiated by a bid protester, not the Comptroller General, and that the Comptroller General may only consider the length of time necessary to decide the bid protest in varying the length of the stay and "is not authorized to consider the importance or wisdom of the purchase decision." Id. at 1111; see also Ameron, 809 F.2d at 997.
 
 
 53
 The authority wielded by the Board under the Transfer Act is significantly greater than that of the Comptroller General under CICA. Unlike CICA, the amended Act does not condition the Board's review authority on third-party complaints; rather, it authorizes the Board to review particular issues considered by the Authority. Second, and more important, the Act does not allow the Authority to override the Board, a safeguard that both Lear and Ameron viewed as vital in concluding that the stay provisions did not vest the Comptroller General with power over persons outside the legislative branch. Lear, 842 F.2d at 1111 ("Were the Comptroller General thus able to stay a procurement contract indefinitely, a serious issue of his control over procurement would be raised ... [However, the override] provision lodges ultimate authority over the timing of the contracts with the executive branch and obviates the problem of an indefinite stay."); Ameron, 809 F.2d at 997 ("If the Comptroller General really does require so much time to decide the protest that the stay interferes with important executive interests, CICA authorizes the executive to override the stay.") (footnote omitted).
 
 
 54
 By contrast, the Directors' inability to override the Board and forestall congressional review is a serious hindrance to the Authority, because many of the decisions subject to review, such as the adoption of budgets, the letting of contracts, and the issuance of bonds, are time-sensitive. Major airports are complex operations, especially when, as here, significant capital improvement programs are in progress. Any delay in the adoption of an annual budget and any suspension of the authority to let contracts or issue bonds can result in millions of dollars of additional costs and can adversely affect the public safety. See Affidavit of James A. Wilding, General Manager of the Authority (Feb. 14, 1994) at 4, 7-9 (supporting Authority's motion for stay of district court's order). The pressure to avoid such costly interruptions by accommodating the Board is self-evident.
 
 
 55
 The Authority acknowledges that the Board is in a position to influence the Directors, but it maintains that the ways in which the Board may affect their decisions are indistinguishable from those by which Congress is able "to advise, coordinate, and even directly influence an executive agency ... through oversight hearings, appropriation and authorization legislation, or direct communication with the [agency]." NRA Political Victory Fund, 6 F.3d at 827. There can be no question that Congress is able to exercise enormous influence over agency decisions in these and other constitutionally permissible ways. But there is a qualitative difference between these channels for congressional influence and the structural relationship between Board and Authority that the Transfer Act has established--the difference between persuasion and coercion.
 
 
 56
 In CAAN, the Court quoted James Madison on the potential that always exists, in democratic societies, for the abuse of legislative power:
 
 
 57
 It will not be denied, that power is of an encroaching nature, and that it ought to be effectually restrained from passing the limits assigned to it.
 
 
 58
 * * * * * *
 
 
 59
 [The legislative department's] constitutional powers being at once more extensive and less susceptible of precise limits, it can with the greater facility, mask under complicated and indirect measures, the encroachments which it makes on the co-ordinate departments. It is not unfrequently a question of real-nicety in legislative bodies, whether the operation of a particular measure, will, or will not extend beyond the legislative sphere.
 
 
 60
 501 U.S. at 274, 111 S.Ct. at 2310-11 (quoting The Federalist No. 48, pp. 332-34 (J. Cooke ed. 1961) (J. Madison)).
 
 
 61
 We acknowledge that we are dealing with "a question of real-nicety," but we are satisfied that Congress has here encroached "beyond the legislative sphere" because the Board of Review has been vested with a range of powers whose cumulative effect is to enable it to interfere impermissibly with the Directors' performance of their independent responsibilities. In the place of the veto provision, the amended Transfer Act empowers the Board to choose, in its sole discretion, which of the Authority's decisions may be implemented immediately and which will be subjected to the risks and delays of congressional review. In the place of mandatory congressional membership on the Board, it sets forth requirements that both in principle and in practice continue to ensure congressional domination of the Board. In redefining the powers of the Board, it actually expands the scope of its review. Moreover, the amended statute retains provisions permitting the Board to compel the Authority to consider particular issues and conditioning the Authority's ability to take vital actions on the Board's own continuing ability to exercise its powers under the Act.
 
 
 62
 What tips the balance, in our judgment, is the Board's power to delay and perhaps overturn critical decisions by requiring their referral to Congress. The delays it can impose are hardly trivial. The 60-legislative-day congressional review period will extend for at least three months and, depending on the congressional cycle, can last as long as six. Affidavit of Pamela Gilbert, Legislative Director of Public Citizen's Congress Watch (May 28, 1992) at 2. Cf. Bliley v. Kelly, 23 F.3d 507, 509 (D.C.Cir.1994) (30-legislative-day congressional review period extended from January 11, 1991 to March 6, 1991--a period of 54 calendar days.) Thus, as Judge Green aptly put it,
 
 
 63
 [u]pon receipt of a "recommendation" from the Board of Review, the Airports Authority has two choices. It can adopt the recommendation ... [or] transmit a detailed description of the proposed action to Congress.... In short, the Airports Authority must either bow to the will of the Board of Review, or risk the time and uncertainty of congressional action. This power is far more than merely "advisory" as defendants claim; it gives the Board of Review the power to coerce the Airports Authority to comply with any "recommendation."
 
 
 64
 Hechinger, 845 F.Supp. at 908. The mere existence of this power to delay provides the Directors with an enormous incentive to avoid confrontations by tailoring their decisions to suit the Board's pleasure; it also gives the Board the power to hold an important decision hostage in order to secure the Directors' agreement to an unrelated matter.
 
 
 65
 We do not suggest that the Board has or would abuse its authority in such a manner. But the potential for abuse is there. As the Supreme Court observed in CAAN,
 
 
 66
 the statutory scheme challenged today provides a blueprint for extensive expansion of the legislative power beyond its constitutionally-confined role. Given the scope of the federal power to dispense benefits to the States in a variety of forms and subject to a host of statutory conditions, Congress could, if this Board of Review were valid, use similar expedients to enable its Members or its agents to retain control, outside the ordinary legislative process, of the activities of state grant recipients charged with executing virtually every aspect of national policy. As James Madison presciently observed, the legislature "can with greater facility, mask under complicated and indirect measures, the encroachments which it makes on the co-ordinate departments."
 
 
 67
 501 U.S. at 277, 111 S.Ct. at 2312 (quoting The Federalist No. 48 at 334 (J. Cooke ed. 1961)). To our mind, Congress's revisions of the Transfer Act have not satisfied the concerns expressed in CAAN. Although the Board's veto power has been eliminated, the nature of the relationship between the Board and the Directors is such that the latter must necessarily trim their sails to accommodate the former's wishes. This, in our judgment, is a sufficient exercise of federal power to violate the doctrine of the separation of powers. Having so determined, it is not necessary for us to classify the nature of that power:
 
 
 68
 If the [Board of Review's] power is executive, the Constitution does not permit an agent of Congress to exercise it. If the power is legislative, Congress must exercise it in conformity with the bicameralism and presentment requirements of Art. I, Sec. 7.
 
 
 69
 CAAN, 501 U.S. at 276, 111 S.Ct. at 2312.
 
 III. CONCLUSION
 
 70
 For the foregoing reasons, we agree with the district court's conclusion that the provisions of the amended Transfer Act, taken together, indicate that the Board of Review remains a congressional agent and that it exercises power in violation of the doctrine of the separation of powers; accordingly, we affirm the district court's judgment. We direct, however, that actions taken by the Board to this date not be invalidated automatically on the basis of our decision. See Buckley v. Valeo, 424 U.S. 1, 142, 96 S.Ct. 612, 693, 46 L.Ed.2d 659 (1976) (past acts of invalidly constituted Commission accorded "de facto validity").
 
 
 71
 So ordered.