## CIRCUIT COURT OF LOUDOUN COUNTY

Fairchild Corporation
and RHI Holdings, Inc.

v.

Metropolitan Washington
Airports Authority

Case No. (Chancery) 18746

BY JUDGE THOMAS D. HORNE

June 23, 1999

This is an action for declaratory relief brought by the Fairchild Corporation and its wholly-owned subsidiary, RHI Holdings, Inc. Fairchild and RHI Holdings seek a declaration of rights and injunctive relief. They suggest that the defendant, Metropolitan Washington Airports Authority ("MWAA" or the "Authority"), is without authority to acquire by eminent domain all or part of complainants' leasehold interest in certain property located at Washington Dulles International Airport.

In June of 1983, Fairchild entered into a contract with the United States to lease 223,489 square feet of land at Dulles Airport. Pursuant to its agreement with the United States, Fairchild began construction of an office building on the site. The forty-year term provided for in the lease commenced upon a determination by the United States that the building was ready for occupancy. The initial term of the lease is to expire on November 30, 2024.

There is a dispute between the parties as to extensions of the lease.

In 1985, the Commonwealth and the District of Columbia enacted enabling legislation authorizing the creation of a regional airport authority for the metropolitan Washington area, the MWAA, which would lease Dulles and National (now Reagan National) Airports from the United States. 1985 Va. Acts, Ch. 598; 1985 D.C. Law 6-67. The Metropolitan Washington Airports Authority was created as:

> a public body corporate and politic and independent of all other bodies, having the powers and jurisdiction hereinafter enumerated, and such other and additional powers as shall be conferred upon it by the legislative authorities of both the Commonwealth of Virginia and the District of Columbia.

1985 Va. Acts, Ch. 598, § 2.

The Virginia Act creating the authority provided that it would consist of eleven members to be appointed by the Governor of Virginia, the Governor of Maryland, the Mayor of the District of Columbia, and the President of the United States. It was expressly provided that:

> the Authority ... is hereby granted full power to exercise the right of eminent domain in the acquisition of any lands, easements, privileges, or other property interests which are necessary for airport and landing field purposes, including the right to acquire by eminent domain aviation easements over lands or water outside the boundaries of its airports or landing fields where necessary in the interests of safety for aircraft to provide unobstructed air space for the landing and taking off of aircraft utilizing its airports and landing fields even though such aviation easement be inconsistent with the continued use of such land, or inconsistent with the maintenance, preservation and renewal of any structure or any tree or other vegetation standing or growing on the land at the time of such acquisition. Proceedings for the acquisition of such lands, easements and privileges by condemnation may be instituted and conducted in the name of the Authority in accordance with Title 25 of the Code of Virginia.

1985 Va. Acts, Ch. 598, § 9(C).

Subsequent to such action by the Virginia General Assembly, Congress passed the Metropolitan Washington Airports Act (Transfer Act). 49 U.S.C. § 49101, *et seq*. On two occasions, the federal act permitting the lease of Dulles and National Airports has undergone judicial scrutiny resulting in

various provisions of the Act being declared unconstitutional. *Metropolitan Washington Airports Authority v. CAAN*, 501 U.S. 252 (1991) (conditioning transfer to MWAA on creation of Congressional Review Board with veto power over decisions of Board of Directors declared unconstitutional); *Hechinger v. Metropolitan Washington Airports Authority*, 36 F.3d 97 (D.C. Cir. 1994) (Board of Review under amended Transfer Act again found unconstitutional as violative of separation of powers). Complainants argue that the instant case presents yet another opportunity for judicial nullification.

This is a case of first impression. Counsel have furnished no authority where the right of the Authority to exercise the power of eminent domain has been challenged. Condemnation proceedings have been conducted in the past without question as to defendant's authority to exercise the power of eminent domain.

Complainants' arguments raise significant questions as to the Authority's ability to proceed with condemnation of the leasehold interest. First, complainants note that the Authority seeks to condemn an interest that arises out of a contract with the United States which was executed prior to the Authority's acquisition of its interest in the airport property. Although granted the power of eminent domain, the Authority is required, according to complainants, to honor leases that were extant at the time it acquired its interest in the airport property. Complainants suggest in their papers that the term of their lease may be extended beyond the term of the lease between the Authority and the United States. It is asserted that to permit the Authority to proceed would thus run afoul of the terms of the Transfer Act, the constitutional prohibition against impairment of contracts, and the Supremacy Clause of the United States Constitution. U. S. Const., art. VI.

Second, the Complainants draw the Court's attention to the limiting terms of the Transfer Act by highlighting the distinction between the provisions of the Transfer Act relating to the exercise of the power of eminent domain and the related provisions of the Washington Metropolitan Area Transit Authority Compact. Like those of the Airports Authority, the actions of the Transit Authority have a profound impact on interstate commerce. The Transit Authority is involved in the planning and regulation of mass transit for the metropolitan Washington area. In the case of the Transfer Act, the compact gives to the MWAA the power of eminent domain "conferred on it by Virginia." In the case of the WMATA, the compact grants the power of eminent domain to the Authority without qualification. This unfettered grant to the Transit Authority has been interpreted as a grant of the federal power of eminent domain. Thus, the Transit Authority may exercise a "quick take" power of eminent domain even when such power violates the constitutional

provisions of one of the signatory states. Conversely, the Airports Authority may not.

This limiting language in the Transfer Act forms the centerpiece of complainants' challenge to the Authority's power to condemn their leasehold interest. They note that the compact should be reviewed using familiar contract principles. As the Court noted in *Cuyler, supra,*

> The requirement of congressional consent is at the heart of the Compact Clause. By vesting in Congress the power to grant or withhold consent, or to condition consent on the States' compliance with specified conditions, the Framers sought to ensure that Congress would maintain ultimate supervision power over cooperative state action that might otherwise interfere with the full and free exercise of federal authority.

*Id.* at 439, 440 (authority omitted).

Complainants suggest that in authorizing the Commonwealth to grant the power of eminent domain, Congress did not condition its consent upon the Commonwealth granting to the Authority the power of eminent domain. Nor did Congress mandate that the Commonwealth grant such power to the Authority. Thus, the grant of the power by the Commonwealth was a unilateral act subject to Virginia and not federal law. Under familiar contract principles, the delegation by the Commonwealth lacks mutuality. Accordingly, the grant of the power of eminent domain cannot be viewed as a provision of the compact. Instead, the delegation by the Commonwealth to the Authority must, according to complainants, be judged not by federal law but by the laws of the Commonwealth.

Complainants further assert that such delegation of the power of eminent domain by the General Assembly to the Authority violates the Constitution of Virginia in that it constitutes an impermissible delegation of a sovereign power. Complainants note that a Board of Directors, the majority of which may vote to exercise the power of eminent domain, controls the Authority. Given the Board's makeup, such a majority could consist entirely of non-Virginian members. That is to say, condemnation of property in Virginia could take place without the inclusion and assent of representatives from the Commonwealth. Various scenarios were suggested by the complainants in which Virginia land use policies could be controlled by regional forces contrary to the will and without regulation by Virginia's duly elected representatives.

Congress has sanctioned the lease of the federally owned Dulles Airport and associated property for a period of 50 years to the MWAA provided the

MWAA is authorized by joint action of the legislatures of Virginia and the District of Columbia to, *inter alia*, "exercise the powers of eminent domain in Virginia that are conferred on it by Virginia." 49 U.S.C. § 49106(b)(1)(D). The Secretary of Transportation and the Airports Authority are authorized to negotiate at any time an extension of the lease. 49 U.S.C. § 49104(d).

Subsequent amendments to the Virginia statute have brought the enabling legislation into conformity with the requirements of the Transfer Act.

Fairchild and RHI Holdings seek in these proceedings a judicial determination that the Airports Authority lacks authority to acquire all or part of Fairchild's leasehold interest by eminent domain and disturb its quiet enjoyment of the leasehold. In addition, they seek injunctive relief to prohibit the Authority from proceeding to acquire any of the leasehold property by eminent domain. Complainants suggest that agents of the defendant have committed repeated trespasses to their property in preparation for the construction of a parking garage. They request that the Court enjoin such trespasses.

The basis for the relief Fairchild seeks is articulated in six numbered counts. In response, the Metropolitan Washington Airports Authority has demurred to each of the counts. Under familiar principles applicable to the consideration of a demurrer, this Court must consider Defendant's challenge only upon the facts as pleaded and the necessary inferences to be drawn from such facts.

Fairchild suggests in Count I that the delegation of the power of eminent domain to the Authority is violative of the Constitution of America. Such complaint is susceptible to a determination as a matter of law on the extant record. It is ripe for adjudication on demurrer.

Complainants contend there are but four categories of entities to which the power of eminent domain may be delegated in the Commonwealth. These are localities, political subdivisions, Virginia public service companies, and transportation district commissions, all of which are subject to the exclusive sovereignty of the Commonwealth of Virginia. The MWAA, however, because of the composition of its Board of Directors, is not, according to complainants, subject to the Commonwealth's exclusive sovereignty. As previously noted, it is possible that a majority of the MWAA's Board, consisting of no members appointed by the Governor of Virginia and confirmed by the General Assembly, could determine whether the power of eminent domain should be exercised within the Commonwealth. Such a delegation of the power of eminent domain would, in complainants' estimation, constitute an "improper surrender, alienation, abridgement, or destruction of the sovereign power of the Commonwealth."

The MWAA has its origins in the actions of the Commonwealth and the District of Columbia. However:

> [b]ecause the Compact creating the MWAA was congressionally sanctioned in accordance with the Compact Clause ("No state shall, without the consent of Congress ... enter into any agreement or compact with another state." Art. I, § 10, cl. 3.), it is a federal law subject to federal construction, notwithstanding its genesis in the enabling acts of Virginia and the District of Columbia.

*Alcorn v. Wolfe*, 827 F. Supp. 47, 51 (1993).

The legislation of Congress, the District of Columbia, and the Commonwealth of Virginia providing for the creation of the MWAA meets the two-pronged test used in determining the existence of a compact within the contemplation of Article 1, § 10, cl. 3, of the United States Constitution. ("No state shall, without the consent of Congress ... enter into any agreement or compact with another state." *Cuyler v. Adams*, 449 U.S. 433 (1983).) Firstly, the Airports Authority has been specifically authorized by Congress to lease the airport facilities for fifty years, and, secondly, the creation of the Authority is an appropriate subject for federal legislation given its significant impact on interstate commerce. Thus, the provisions of the Act enjoy supremacy over inconsistent state statutory and constitutional mandates and must be interpreted in light of federal law. *Washington Metro. Area T. A. v. One Parcel of Land*, 706 F.2d 1312 (1983).

Furthermore, the Court believes that the provisions of the Transfer Act and of the enabling legislation passed by the District of Columbia and the Commonwealth must be harmonized within the context of the legislative history giving rise to the creation of the Authority. Thus, the grant contained in the Virginia enabling act, which preceded the adoption of the Transfer Act, contains the grant of the power to the Authority, which Congress later approved in accordance with its constitutional right of review. Once approved, the delegation became a matter of federal law not subject to state constitutional restrictions.

A compact between the States, sanctioned by Congress, is "a consensual agreement, the meaning of which, because made by different States acting under the Constitution and with congressional approval, is a question of federal law." *Petty v. Tennessee-Missouri Bridge Commission*, 359 U.S. 275, 279 (1959). The terms of the compact "cannot be modified unilaterally by state legislation and take precedence over conflicting state law." *Alcorn, supra*, at 51, 52 (authorities omitted). As Justice Frankfurter, in commenting upon the Compact Clause, observed:

> The growing interdependence of regional interest, calling for regional adjustments, has brought extensive use of compacts. A compact is more than a supple device for dealing with interests confined within a region. That it is also a means of safeguarding the national interest is well illustrated in the Compact now under review.

*State v. Sims, supra*, 341 U.S. 22, 27 (1951).

Here, the General Assembly elected to delegate the power of eminent domain to an independent corporate body established to acquire, by lease, Dulles and National Airports. Fairchild's view of the limitations of the grant is too restrictive. In determining whether or not the General Assembly has acted contrary to the Constitution, the Court may not limit itself to a consideration of the four categories enumerated by the complainants.

Accordingly, it is the Court's opinion that in conferring the power of eminent domain upon the Authority, the General Assembly violated no provision of the Constitution of Virginia. Its actions involved a "conventional grant of legislative power." *State v. Sims*, 341 U.S. 22, 30, 31 (1951). Not only does the grant provide for a delegation of the power, but also for the procedures to be followed should condemnation proceedings be instituted. *See Delaware River Joint Toll Bridge Com'n. etc. v. Colburn*, 310 U.S. 419 (1940). There is no limitation such as the one complainants assert on the grant of the power of eminent domain.

The question then arises as to whether such a delegation of the power of eminent domain is proper, that is whether the delegation implicates a public use. As the Court observed in *Phillips v. Fuster*, 215 Va. 543 (1975):

> It has been universally held that the spirit of the Constitution of Virginia and the Federal Constitution prohibits the taking of private property for private use under any conditions .... The salient consideration is not whether a *public benefit* results, but whether a public *use* is predominant ... the *public use* implies a possession, occupation, and enjoyment of the land by the public at large, or by public agencies.

*Id.* at 546, 547 (authorities omitted).

In other words, the result obtained from the exercise of the power of eminent domain delegated by the General Assembly must be one not of incidental benefit, but one for the use of the citizens of the Commonwealth. "The right of the public to receive and enjoy the benefit of the use is the determining factor whether the use is public or private." *Iron Co. v. Pipeline Co.*, 206 Va. 711, 715 (1966). Whether or not a public use is served by

condemnation of the subject leasehold is an issue subject to judicial review.

Here, the MWAA operates under a mandate from the United States, Commonwealth of Virginia, and District of Columbia with specific enumerated powers. 1985 Va. Acts, Ch. 598, § 2. In the exercise of the power of eminent domain, the Authority is authorized to acquire "lands, easements, privileges, or other property interests which are necessary for airport and landing field purposes." *Id.* at § 9(C).

Dulles and National Airports are transportation centers in the Commonwealth. They serve vast numbers of patrons and play significant roles in the economy of the region. Their close proximity to the nation's capital makes them key players in the economic and political life of the country. Although not subject to regulatory control by the Commonwealth, the use of the property acquired by the Authority through its lease with the federal government is inherently public. *See generally*, 26 Am. Jur. 2d, *Eminent Domain*, § 24.

Clearly, then, this is not a situation where the General Assembly has improperly removed from the representatives the power to exercise legislative authority. *Fairfax County v. Fleet Industrial Park*, 242 Va. 426 (1991). Accordingly, the Court finds that while the Authority exercises its power of eminent domain pursuant to an Article I compact, even were this not so, the General Assembly's delegation of the exercise of the power of eminent domain to the MWAA is not violative of the Constitution of Virginia. Thus, the demurrer will be sustained as to Count I of the Bill of Complaint.

It should be added, however, that resolution of the specific issue of whether, under the facts of this case, a public use is implicated by the instant taking must await an evidentiary hearing. As the Court noted in *Iron Company, supra*:

> The critical inquiry is whether the taking ... is necessary for its use in serving the public, that is, whether the taking is for a public use.
>
> These constitutional limitations on the delegation of the power of eminent domain have been fixed by our former decisions: (1) the taking must be for a public use; private property cannot be taken for private use; (2) the use must be needful for the public; and (3) the rights of the public to use the facilities must be adequately protected.

*Id.* at 715.

The issue of the necessity of the instant taking is not one that can be determined on demurrer; hence, the Court makes no finding here with respect to the necessity of such taking. Clearly, though, the power of the Authority to condemn a leasehold interest in property for a public use is unassailable.

In Count II, complainants contend that Fairchild's contract with the United States is a vested, substantive contract right protected from impairment by subsequent legislation. U. S. Const., art. I, § 10; Va. Const., art. I, § 11. Fairchild and the United States entered into the lease of the subject property prior to the enactment by the General Assembly of the enabling legislation creating the Airports Authority. Thus, complainants assert that the exercise of the power of eminent domain pursuant to the enabling legislation, coming only after the execution of the lease, would constitute an unconstitutional impairment of their rights under the contract.

The Authority here seeks to exercise the power of eminent domain. Complainants rely on *Heublein, Inc. v. Alcoholic Beverage Control Dept.*, 237 Va. 192 (1989), in support of their position. In *Heublein* the Court concluded that the relevant provisions of the Virginia Wine Franchise Act were violative of the Contract Clause of the Virginia Constitution in that the questioned legislation was "not a proper exercise of the police power but simply an effort to protect a small group of wholesalers from possible economic loss." *Id*. at 197. Thus, *Heublein* did not involve the exercise of the power of eminent domain. In contrast, it has long been recognized that the exercise of the power of eminent domain is an incident of state sovereignty which is "essential to advance the public interest." Accordingly, the exercise of the power does not implicate the Contract Clause of the Constitution of Virginia or the United States. *West River Bridge Co. v. Dix*, 47 U.S. 507, 536 (1848).

Pursuant to its agreement with the United States, the Authority retains the interest of the United States in complainants' lease during the period of its fifty-year lease of the airport facilities from the federal government. The United States has waived any interest it may claim during that period, as has the Authority. Although the Complainants' lease may have been executed prior to the date of the creation of the Authority and the execution of the federal lease, this does not, as a matter of federal law, limit the power of eminent domain. The implications of an extension of the complainants' lease beyond the expiration date of the Authority's lease with the United States involve factual matters that cannot be settled on demurrer and are critical to a determination of the contract and supremacy issues raised in Count II.

Adjudication of the allegations contained in Count II is thus not ripe for determination, and the demurrer should be overruled as to such count. However, to the extent that the period of the complainants' lease does not exceed that of the Authority's lease with the United States, the Court finds that the Authority is not prohibited from the exercise of the power of eminent domain by reason of its interference with the preexisting lease between the United States and Fairchild.

In Count III, the complainants assert that the Airports Authority has no authority to condemn federal lands. Absent condemnation, and with the continued performance by the parties during the balance of the period of the lease, the Authority would remain as complainants' landlord. As noted earlier, the complainants have observed that the language of the Transfer Act provides that the Authority may only "exercise the powers of eminent domain in Virginia that are conferred on it by Virginia." 49 U.S.C. § 49106(b). They have thus argued that the delegation of the power is limited to that which the General Assembly was capable of conferring on the Authority. The Court has rejected this argument, concluding that while it was not the intent of the parties that a federal right of eminent domain be conferred on the Authority, the exercise of the power of eminent domain arises out of a compact and must therefore be interpreted in light of federal law. Complainants contend that under the Supremacy Clause, the Airports Authority cannot condemn federal lands. U. S. Const., art. IV, § 3. The Court agrees. However, it is asserted that the interest sought to be condemned is only the leasehold interest of the complainants.

Whether the Authority in fact seeks to condemn an interest of the United States is a matter of fact that cannot be resolved on demurrer. Absent the consent of Congress, the Authority cannot condemn federal property. No such consent is contained within the compact. *See Transwestern Pipeline Co. v. Kerr-McGee Corp.*, 492 F.2d 878 (1974).

The Transfer Act provides that:

[t]he Metropolitan Washington Airports and the Airports Authority are not subject to the requirements of any law solely by reason of the retention of the United States Government of the fee simple title to those Airports.

49 U.S.C. § 49111(b).

While this would limit the applicability of various statutes during the period of the lease by the Authority from the United States, it does not constitute an abandonment of the interest of the federal government. Further, if the interest of the United States in the instant lease were to be affected by the condemnation to the extent that it became a "condemnation action against the United States," such action would be barred. *Transwestern Pipeline Co., supra*, at 883.

The Airports Authority, however, is the successor in interest to the lease between the United States and Fairchild. Furthermore, Fairchild's instant lease will expire prior to the lease between the Authority and the federal government. Thus, if the inquiry were to end here, the Authority could

condemn complainants' leasehold as a proper exercise of the power granted to it by Congress. Such a condemnation would not, in the opinion of the Court, be barred by the general proposition that absent congressional assent, property of the federal government is not subject to condemnation. *See City of Sacramento v. Secretary of HUD*, 363 F. Supp. 736 (E.D. Cal. 1972); *United States ex rel. Tennessee Valley Authority v. Welch*, 327 U.S. 546 (1946).

However, this matter cannot be concluded on demurrer. In addition to the issue of the impact of the taking on the interest of the United States, complainants have suggested that their lease may be extended beyond the period of the Authority's lease with the federal government. These issues, like those presented in Count II, involve issues of fact that cannot be resolved on the instant demurrer. Accordingly, the demurrer is overruled as to Count III.

Complainants next challenge MWAA's exercise of the power of eminent domain based upon the express terms of the Virginia, D.C., and United States enabling legislation. The applicable provisions of the legislation are to be found in § 22(C) of the Virginia Act ("The Authority shall be responsible for all executory contracts entered into by the United States with respect to the former Metropolitan Washington Airports Authority before the date of acquisition of those airports.") and in § 49104(6)(A) of the federal enabling legislation ("The Airports Authority shall assume all rights, liabilities, and obligations ... including leases."). These provisions are to be read in connection with the provisions of the Virginia Act indicating that the statute should be construed liberally. 1985 Va. Acts, Ch. 598, § 24.

The Court is of the opinion that the limitations contained in the Transfer Act and Virginia enabling legislation were meant only to ensure that the leases of airport property in existence at the time of the transfer were honored. They are not an expression of an intent to restrict the ability of the Authority to conduct eminent domain proceedings. In fact, the intent of the parties to the compact was to expressly provide, in contrast to the common law rule, for a liberal construction of the provisions relating to the exercise of the power of eminent domain.

Although statutes conferring the power of eminent domain are generally subject to the rule of strict construction, this maxim is inapplicable where, as in the instant case, the legislature has expressed a contrary intent. Here, public policy demands that when necessary to provide efficient services to the public, the Authority be permitted to exercise the right of eminent domain over leasehold interests existing prior to the transfer by the United States of such interests to he MWAA. The creation of the Authority was, therefore, not intended to lock in time extant leasehold interests, the future acquisition of

which might become necessary as the demands on the airport increased.

Accordingly, as Count IV is ripe for adjudication on the instant pleadings, the demurrer thereto will be sustained.

Count V (alleging arbitrary and capricious conduct by the defendant and a lack of necessity) and Count VI (alleging trespass by the Authority's agents on the leasehold of the complainants) raise factual issues that cannot be resolved on demurrer. Although Count V would ordinarily be raised in the condemnation proceeding, such a practice does not constitute a bar to proceeding in the instant chancery cause. Accordingly, the demurrers to Counts V and VI are overruled.

As this case is before the Court on demurrer, the decision of the Court must rest on the scant record before it. However, in determining this matter, the Court has been mindful of the burden which complainants must carry in demonstrating the unconstitutionality of the Authority's exercise of the power of eminent domain. *Walton v. Commonwealth*, 255 Va. 422 (1998).

### January 11, 2000

In their Amended Bill of Complaint, the Fairchild Corporation and RHI Holdings, Inc., once again challenge the right of the Metropolitan Washington Airports Authority to proceed with the condemnation of a portion of the leasehold interest obtained by Fairchild from the federal government and assigned to RHI. Reference is made to the letter opinion of this Court of June 23, 1999, for an earlier discussion of the statutes and documents relevant to many of the issues raised in the instant proceedings.

The Amended Bill of Complaint contains eight numbered counts. In those counts it is asserted as follows:

Count I. The delegation of eminent domain to the authority violates the Virginia Constitution because it surrenders Virginia's sovereign power.

Count II. Any Federal requirement that Virginia grant eminent domain power improperly commandeers Virginia's sovereign powers.

Count III. The creation and structure of the Authority violates the United States Constitution.

Count IV. The Virginia enabling legislation is unconstitutional as applied to Fairchild because the delegation and exercise of eminent domain powers will impair Fairchild's contract.

Count V. The Authority has no power to condemn Federal lands.

Count VI. Under established rules of strict construction, the Airports Authority's power to condemn is limited and expressly subject to honoring Fairchild's leases.

Count VII. There is no necessity for the taking of Fairchild's property.

Count VIII. Injunction against defendant's repeated trespasses.

In response to the Amended Bill, the Airports Authority filed a demurrer, motion to strike, and answer. It requests that the Court strike and dismiss Counts I and VI as these counts contain substantially the same allegations as those previously dismissed by the Court. By order entered on August 6, 1999, the Court did dismiss certain counts set forth in the original Bill of Complaint for the reasons set forth in detail in its letter opinion of June 23, 1999. Complainants have been permitted to reargue these issues as if raised by a motion for reconsideration.

The Airports Authority has demurred to Counts I, II, III, and VI. There being factual issues raised with respect to the claims asserted in Counts IV, V, VII, and VIII, the Court proceeded to take evidence as to such claims, excepting the complaint of trespass.

In its earlier letter opinion, this Court observed that the Authority is a creature of a congressionally sanctioned compact between the Commonwealth of Virginia and the District of Columbia. Art. I, § 10, cl. 3, Constitution of the United States. Thus, this agreement "is a federal law subject to federal construction, notwithstanding its genesis in the enabling acts of Virginia and the District of Columbia." *Alcorn v. Wolfe*, 827 F. Supp. 47, 51 (1993). In accordance with the terms of the agreement, the Virginia General Assembly was charged with defining the limits of the power of eminent domain to be exercised by the Authority as a matter of federal law. It did so through enabling legislation that provided for a grant to the Authority of the "full power to exercise the right of eminent domain in the acquisition of any lands, easements, privileges, or other property interests which are necessary for airport and landing field purposes." 1985 Va. Acts, Ch. 598, § 9(C). The Court sees no reason to depart from its earlier position in this regard.

The power to take private property for public uses is an essential attribute of sovereignty. *Evans v. Smyth-Wythe Airport Commission*, 255 Va. 69, 72 (1998). But for the existence of the compact, it may be fairly argued that the General Assembly of Virginia could not independently delegate to the Authority the power of eminent domain where the only limitation placed upon the exercise of the power would be for "airport purposes." Such a delegation may very well offend the Constitution of Virginia. However, it is not the Commonwealth's power that the Authority seeks to exercise, but that which is derived from a compact sanctioned by Congress. *Washington Metro. Area T. A. v. One Parcel of Land*, 706 F.2d 1312 (1983).

Complainants then posit the following hypothesis. If the Court determines that the power of eminent domain was not voluntarily relinquished by Virginia (an act that would violate the Virginia Constitution), then it must have been

mandated by Congress. Such a commandeering of state sovereignty by the Federal Government could not then survive constitutional scrutiny under the Tenth Amendment to the United States Constitution, complainants argue.

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." An act of Congress that mandates or commandeers action by a state legislature violates the Tenth Amendment. *New York v. United States*, 505 U.S. 144 (1992). The Court noted in *New York* that:

> the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the states .... In providing for a stronger central government, therefore, the Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States. As we have seen, the Court has consistently respected this choice. We have always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts.

*Id.* at 155, 156, and 166.

Accountability to the people is a significant characteristic in distinguishing a proper federal regulation from an impermissible mandate. The Supreme Court observed in *New York* that:

> [w]here Congress encourages state regulation rather than compelling it, state governments remain responsive to the local electorate's preferences; state officials remain accountable to the people. By contrast, where the Federal Government compels States to regulate, the accountability of both state and federal officials is diminished.

*Id.* at 168.

However, here the power of eminent domain that the Authority seeks to exercise is not the product of a federal mandate. No federal commandeering of action by the Commonwealth has occurred. Although the limits of accountability are obscured, such a blurring of the object of responsibility is inherent in compact agencies.

The Authority's power to pursue eminent domain proceedings against the complainants' leasehold traces its origins to the Compact Clause of the Constitution. It has been observed that:

[b]ecause Compact Clause entities owe their existence to state and federal sovereigns acting cooperatively, and not to any "one of the United States," their political accountability is diffuse; they lack the tight tie to the people of one State that an instrument of a single State has: "An interstate compact, by its very nature, shifts a part of a state's authority to another state or states, or to the agency the several states jointly create to run the compact. Such an agency under the control of special interests or gubernatorially appointed represent-atives is two or more steps removed from popular control, or even of control by a local government." In sum, within any single State in our representative democracy, voters may exercise their political will to direct state policy; bistate entities created by compact, however, are not subject to the unilateral control of any one of the States that compose the federal system.

*Hess v. Port Authority Trans-Hudson*, 513 U.S. 30, 42 (1994) (citations omitted).

It is congressional consent that "is at the heart of the Compact Clause." *Cuyler v. Adams*, 449 U.S. 433, 439 (1981).

Congressional consent is not required for interstate agreements that fall outside the scope of the Compact Clause .... But where Congress has authorized the States to enter into a cooperative agreement, and where the subject matter of that agreement is an appropriate subject for congressional legislation, the consent of Congress transforms the States' agreement into federal law under the Compact Clause. Congress may consent to an interstate compact by authorizing joint state action in advance or by giving expressed or implied approval to an agreement the States have already joined.

*Id.* at 440, 441.

In the instant case, Congress gave its consent in the Transfer Act to the exercise of the power of eminent domain by the Authority as provided for in the Virginia enabling legislation. As noted earlier, the creation of the Authority and the leasing of federal lands were appropriate subjects for congressional legislation.

Based on the reasoning applied by the Supreme Court in *New York, supra,* this Court need not concern itself with whether the test applied in *Columbia River Gorge United Protecting People and Property v. Yeutter*, 960 F.2d 110 (9th Cir. 1992), should be applied in analyzing the instant complainants'

Tenth Amendment related arguments. The Court in *Columbia River* held as follows:

> We have already determined that the Act is within Congress' power under the Commerce Clause. For a similar reason, the Act cannot be a violation of the Tenth Amendment. Since the Act is within the powers granted to Congress under the Commerce Clause, it cannot constitute an exercise of a power reserved to the states.

Complainants' Tenth Amendment claim would fail such a test. However, the power of eminent domain to be exercised by the Authority is derived from the Compact Clause. Article I, § 10, of the United States Constitution.

In granting its approval to the contract, Congress merely sanctioned what the other parties had already agreed upon or set conditions for its approval. Metropolitan Washington Airports Act (Transfer Act), 49 U.S.C. § 49101 *et seq*. The Commonwealth was neither commandeered nor commanded by Congress to grant such power to the Authority.

Accordingly, the Court affirms its earlier decision on this matter as contained in the June 23, 1999, letter opinion and will dismiss Count I.

Count VI of the Amended Bill contains a claim that is substantially the same as that stated in Count IV of the original Bill of Complaint, which was previously ruled upon by this Court. The Court sees no reason to vary from its earlier opinion. Thus, for the reasons previously stated in its letter opinion of June 23, 1999, the motion to dismiss will be granted as to Count VI.

In addition, the Court finds that the "plain statement rule" is inapplicable to this case. As counsel observed in their papers, the "plain statement rule" is a rule of statutory construction which requires Congress to make its intention "unmistakably clear" when it seeks to legislate with respect to an essential state interest. *Gregory v. Ashcroft*, 501 U.S. 452 (1991); *BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994). As the Court noted in *Gregory*:

> Congressional interference with this decision of the people of Missouri, defining their constitutional officers, would upset the usual constitutional balance of federal and state powers. For this reason, "it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides" this balance. We explained recently: "[I]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute' ... ." This plain statement rule is nothing more than an acknowledgment that the States retain substantial sovereign powers

under our constitutional scheme, powers with which Congress does not readily interfere.

501 U.S. at 460, 461 (citations omitted).

As counsel for the Authority have observed, the grant of the power of eminent domain to the Authority was not a condition imposed by federal mandate but instead a condition voluntarily agreed upon by the parties and submitted for approval by Congress. Congress did not, in expressing its consent in the Transfer Act, intend to alter the constitutional balance between the states and the federal government.

In Count II of the Amended Bill, complainants contend that, contrary to the command of the Tenth Amendment of the United States Constitution, the Federal Transfer Act compels a delegation of the power of eminent domain by the Commonwealth. As noted earlier, the power of the Authority to institute eminent domain proceedings against the complainants' leasehold interest is derived from an Article I compact. Accordingly, the demurrer to Count II of the Amended Bill will be sustained and the count dismissed.

Complainants contend in Count III of the Amended Bill that the creation and structure of the Airports Authority violate Article IV, Section 4, of the Constitution of the United States. They assert that the structure of the Authority conflicts with the principles of a republican form of government. The Authority suggests that judicial review be foreclosed by the political question doctrine.

The Supreme Court has noted with respect to issues relating to the Guarantee Clause as follows:

> We approach the issue with some trepidation, because the Guarantee Clause has been an infrequent basis for litigation throughout our history. In most cases in which the Court has been asked to apply the Clause, the Court has found the claims presented to be nonjusticiable under the "political question" doctrine.

*New York*, 505 U.S. at 184.

If the Supreme Court of the United States approaches this issue with "some trepidation," it is with an abundance of caution that this Court rules upon this issue. Nevertheless, even if the Court were to assume that a justiciable claim exists as to Count III, which it does not, the structure of the Authority does not affect the Commonwealth's form of government. Instead, the instant case relates to a Compact agency, one in which political accountability is, as previously noted, "diffuse." Accordingly, the demurrer to Count III will be sustained and the count dismissed.

The Court earlier identified factual issues relating to the complainants' assertion that federal lands might be affected by the exercise of the power of eminent domain. As counsel for the Authority have observed, the provisions of the lease between the United States and the Authority are sufficiently broad to permit the Authority to construct a garage on the leased premises without affecting its reversionary interest. During the period of the lease, the Authority may use the property for airport uses, whether or not such uses may require, involve, or have an impact on the construction, alteration, or removal of structures. Based upon the evidence before it, the Court will find for the defendant and against the complainants as to Counts IV, V, VI, and VII. The Authority may proceed to condemn the interest in the leasehold without affecting the reversionary interest of the United States.

Lastly, the complainants assert that the Authority failed to follow the necessary procedural requirements antecedent to instituting condemnation proceedings. They contend that an amendment to the master plan for the airport requires that the same notice be given as that required for the alteration, amendment, or modification of a regulation. This contention is predicated on the conclusion that the master plan is a rule or regulation "pertaining to the use, maintenance, and operation of its facilities." Va. Acts of Assembly, Chapter 598, § 6 (1985); Va. Acts of Assembly, Chapter 665, § 6 (1987) (amending and reenacting §§ 1, 4, 5, 6, 7, and 27 of Chapter 598); Va. Acts of Assembly, Chapter 610, § 6 (1991). A failure to follow the necessary procedural steps applicable to the amendment of a regulation is, according to complainants, fatal to the amendment. Such action would, in their view, be both arbitrary and capricious.

Pivotal to a determination of this issue is whether an amendment to the master plan for the airport would require the notice necessary for the adoption of a rule or regulation. The Court finds that it does not. A review of the enabling legislation and of the Federal Transfer Act indicates a legislative intent inapposite to the complainants' position. The language of the enabling legislation does not specifically identify the master plan as a regulation. Authority rules and regulations "having the force and effect of law" are identified as Class 1 misdemeanors unless otherwise specified by the enabling legislation or unless a "lesser penalty" is set out by the Authority in the rule or regulation. Va. Acts of Assembly, Chapter 610, § 6(F). The Court finds such a penal provision to be inconsistent with the master plan as a land use development tool. This distinction is noted in the Federal Transfer Act, Title VI, Public Law 99-500, as reenacted in Public Law 99-591, October 18, 1986, as amended by Public Law 102-240, Title VII, 49 U.S.C. App. 2451, *et seq.*

The Court finds, therefore, that amendments to the master plan for the airport do not require the notice necessary for the adoption of a rule or regulation. Accordingly, the failure to give such notice does not invalidate the board's decision relative to the condemnation of the complainants' leasehold.

The Court finds that the Authority may proceed with the condemnation of the leasehold interest of the complainants.